UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FROST SOLUTIONS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: |
| | ) | JURY DEMANDED |
| CORY MOORE, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

NOW COMES the Plaintiff, FROST SOLUTIONS, LLC, by and through its attorneys, KONICEK & DILLON, P.C., and as and for its Complaint for Injunctive Relief and Damages against CORY MOORE ("Moore"), Plaintiff alleges as follows:

**NATURE OF THE ACTION**

1. This action seeks damages and injunctive relief arising from Moore's breach of federal and state trade secret acts and confidentiality agreements.

2. Moore executed a confidentiality agreement prior to, and as a condition of, his employment with Frost Control on or around February 24, 2020. The confidentiality agreement prohibited Moore from disclosing Frost Control's (or its successors') proprietary information, including, *inter alia*, information relating to Frost Control's suppliers, customers, price lists, marketing plans, business plans and financial data.

3. After resigning as Director of Sales for Frost Control Systems, Inc., an Indiana limited liability company, and its successor Frost Solutions, LLC d/b/a Frost Technologies, a Delaware corporation with its principal place of business in South Bend, Indiana, (collectively

1

"Frost"), Moore began using Frost's trade secrets, customer lists and confidential information to solicit customers.

4. Moore resigned from Frost on or around late March of 2022. Thereafter, a few months later, Moore began working for Tapco, LLC.

5. By using Frost's confidential information to directly compete with Frost and breaching his contractual commitments to Frost, Moore is liable for breaching his fiduciary duty to, and contract with, Frost. Moore is also liable for tortiously interfering with Frost's contracts and tortiously interfering with Frost's prospective business advantage.

## THE PARTIES

6. Plaintiff Frost Solutions, LLC is a Delaware limited liability company with its principal place of business in Chicago, Illinois. The sole member of Frost Solutions, LLC is Clashmore Ventures, LLC, whose two members are Michael Kirsh and Michael Bott. Both Kirsh and Bott reside in Illinois. Thus, Frost Solutions, LLC is a citizen of Illinois.

7. Moore is an individual and the former Director of Sales for Frost Control. Upon information and belief, Moore is a resident of Grand Rapids, Michigan. Moore is therefore a citizen of Michigan.

## JURISDICTION AND VENUE

8. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (actions arising under the laws of the United States) as this action arises, in part, under the federal Defend Trade Secrets Act, § 18 U.S.C. 1831 *et seq.*

9. The Court has supplemental jurisdiction over the state law claims in this action pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction over claims relating to those for which

the court has original jurisdiction) as each of the claims in this action are so closely related that they form part of the same case or controversy.

10. Additionally, this Court has complete diversity jurisdiction under 28 U.S.C. § 1332(a).

11. This Court has personal jurisdiction over Moore, as he conducts business and sales in Illinois.

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) as a substantial portion of the acts, omissions, and transactions giving rise to Frost Solutions, LLC's injuries occurred in this district.

## FACTUAL BACKGROUND

13. Frost Solutions, LLC - and its predecessor Frost Control - is an innovative manufacturer of a proprietary weather-security product called the Advanced Infrared Monitoring System ("AIMS").

14. AIMS is a fully-integrated, wireless, weather platform that empowers operators with the information needed about weather conditions so that they can make real-time operational decisions. AIMS provides operators with high-definition imagery and night vision, accurate weather atmospherics, forecasting and pavement temperature. AIMS is available from anywhere via mobile web or desktop applications, so operators can monitor road conditions throughout the country from virtually anywhere.

15. Frost sells its trusted weather monitoring products, including the proprietary AIMS technology, in twenty-six (26) states and two (2) Canadian provinces.

16. Frost also provides safe, reliable and cost-effective services for customers who use their AIMS technology, including by providing support, repairs and analytics.

17. Frost Control was formed in October 2017. Frost Solutions, LLC was formed as a Delaware limited liability company on June 2, 2022. It became registered to conduct business in Illinois on July 12, 2022. On August 9, 2022, Frost Solutions, LLC purchased all of the assets of Frost Control, including, without limitation, all contract rights, general intangibles, customer lists, claims and intellectual property. As such, Frost Solutions, LLC became a successor to certain assets and rights of Frost Control.

18. Frost Solutions, LLC and its predecessor, Frost Control, have spent years and millions of dollars in developing their business and expertise in the weather-security industry, and developing trade secrets and confidential information. Such trade secrets and confidential information give Frost Solutions, LLC a competitive edge over its peers.

19. Frost Solutions, LLC's trade secrets include financial, business, technical, economic and customer information, including the identity of current, former and prospective customers and non-public information relating to long-standing customer relationships, customer purchasing history and financial information, work on development of new customers and company marketing and sales strategies for economic growth.

20. Frost Solutions, LLC's trade secrets also include (i) proprietary technology, including AIMS; (ii) overall computer systems and software architecture associated with AIMS technology; (iii) information about product design and development; and (iv) information related to specific vendor and supplier performance, as that information relates to the reliability and efficacy of the components of Frost Solutions, LLC's specific product.

21. Frost Solutions, LLC and its predecessor have taken reasonable measures to safeguard their trade secrets. For instance, Frost Solutions, LLC and its predecessor implemented and utilized a confidentiality agreement that employees are required to execute at the start of their employment, including, for example, the Confidentiality Agreement that Moore entered into when he started with Frost Control. These confidentiality agreements require, among other provisions, the assignment of rights to any invention made during an employee's time at Frost Solutions, LLC and non-disclosure of Frost Solutions, LLC's proprietary information.

22. Frost Solutions, LLC and its predecessor implemented a policy of terminating access to confidential information at the conclusion of an individual's employment to safeguard their trade secrets.

**Frost Hires Moore**

23. In February 2020, Frost Control extended a written offer of employment to Moore by way of an offer letter. (Ex. 1, Moore Offer Letter). The offer letter provided that Moore, upon accepting Frost Control's offer, would become Regional Manager of Sales and Business Development.

24. As a condition of employment, Moore was required to execute a "Confidential and Invention Assignment Agreement." (Ex. 2, Confidentiality Agreement). The Confidentiality Agreement included a protection of confidential information clause. The clause states in pertinent part:

Confidential Information.

(a) **Protection of Information.** I understand that during the Relationship, the Company intends to provide me with certain information, including Confidential Information (as defined below), without which I would not be able to perform my

5

duties to the Company. At all times during the term of the Relationship and thereafter, I shall hold in strictest confidence, and not use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item.

**(b) Confidential Information**. I understand that "Confidential Information" means any and all information and physical manifestations thereof not generally known or available outside the Company and information and physical manifestations thereof entrusted to the Company in confidence by third parties, whether or not such information is patentable, copyrightable or otherwise legally protectable. Confidential Information includes, without limitation: (i) Company Inventions (as defined below); and (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

*Id.* (emphasis added).

25. Exhibit B to the Confidentiality Agreement includes an interference clause that prohibited Moore from interfering with Frost's customer relationships or otherwise influencing them to direct any purchases of products or services away from Frost. Said clause states:

> Further, I agree that I shall not use any Confidential Information of the Company of the Company to influence any of the Company's clients or

6

customers from purchasing Company products or services or to solicit or influence or attempt to influence any client, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

26. Moore accepted the offer and executed the Confidentiality Agreement on February 24, 2020.

27. After executing the Confidentiality Agreement Moore had access to and made use of Frost's confidential information and trade secrets, including customer and prospective customer information. Moore also had access to Frost's longstanding customer relationships and internal business strategies.

**Moore Resigns from Frost and Joins TAPCO, LLC**

28. Moore resigned from his employment with Frost Control in or around late March of 2022.

29. Shortly thereafter, Moore joined TAPCO, LLC as a National Account Executive.

30. Moore interfered with Frost's business relationships by diverting accounts held by Frost. Moore began soliciting Frost's customers, and it is believed he has succeeded in obtaining the business of at least one or more of Frost's customers.

**Frost Discovers Moore's Unlawful Actions**

31. In June 2022, Frost learned that Moore joined TAPCO, LLC, a customer of Frost's. Frost had reason to believe that Moore began soliciting Frost's customers to conduct business with competitors of Frost's. Frost suspected that Moore may have used Frost's trade secrets and confidential information in order to solicit Frost's customers.

32. On September 2, 2022, Frost's former counsel sent Moore a letter demanding that he cease from engaging in any unlawful interference with Frost's customer relationships. (Ex. 3, September 3, 2022, Cease and Desist Letter).

33. Given the above, coupled with the fact that Moore played a role that has caused certain Frost business relationships to sever and begin to establish business relationships with competitors, it is believed that Moore has been disclosing Frost's confidential information and trade secrets, and will continue to do so to the detriment of Frost and in violation of Moore's continuing contractual obligations to Frost.

## COUNT I
**Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.**

34. Frost incorporates by reference all of the allegations contained in paragraphs 1-35 as if alleged in this paragraph.

35. The Defend Trade Secrets Act prohibits the misappropriation of trade secrets.

36. Frost has developed and owns valuable trade secrets related to its products and services that are used in, or intended for use in, interstate or foreign commerce.

37. Frost's trade secrets have value because they are not generally known to the public and are not readily ascertainable.

38. Frost's trade secrets include financial business information, technical, economic and customer information, including the identity of current, former and prospective customers and non-public information related to longstanding customer relationships, work on development of new customers, and company marketing and sale strategies for economic

growth. Frost's trade secrets also include customer bid information, pricing models, proposal response strategies and other information related to the procurement of customer contracts.

39. Frost has taken reasonable measures to safeguard its trade secrets. For instance, Frost and its predecessor implemented a confidentiality agreement that employees with access to confidential information must execute as a condition of employment. This confidentiality agreement expressly prohibits disclosure of confidential business information and trade secrets to third parties without Frost's authorization. As noted, Moore executed a confidentiality agreement as a condition of his employment to prohibit him from using the aforementioned confidential information in the event Moore left Frost.

40. Frost has also implemented a policy of safeguarding its systems with password protections to further safeguard its trade secrets. Specifically, Frost and its predecessor require employees to maintain secret and secure network passwords to Frost systems, which limit access to trade secrets and confidential information stored on those systems to individual employees on a need-to-know basis.

41. Frost and its predecessor also implemented a policy of terminating access to confidential information at the conclusion of an individual's employment to further safeguard its trade secrets.

42. Moore has obtained an economic benefit from the theft of Frost's trade secrets, including the stealing of Frost's existing and prospective customers and business opportunities.

43. Moore acquired and used Frost's trade secrets while Frost and knew or should have known this information was not to be used after his departure from Frost. Despite this, Moore used this information to solicit Frost customers.

9

44. As a result of Moore's unlawful actions, Frost has suffered harm, including the loss of business, the loss of customer goodwill and the lost value derived from Frost and its predecessor's investment in a large amount of time and resources to develop proprietary and confidential information that gives Frost an advantage over its competitors, in an amount to be determined at trial.

45. Frost has suffered irreparable harm due to Moore's ongoing violations of the Defend Trade Secrets Act and will continue to do so unless Moore is enjoined from his wrongful conduct.

## COUNT II
### Violation of the Illinois Trade Secrets Act, 765 ILCS 1065 *et seq.*

46. Frost incorporates by reference all of the allegations contained in paragraphs 1-45 as if alleged in this paragraph.

47. The Illinois Trade Secrets Act prohibits the misappropriation of trade secrets.

48. Frost has developed and owns valuable trade secrets related to its products and services that are used in, or intended for use in, interstate or foreign commerce.

49. Frost's trade secrets have value because they are not generally known to the public and are not readily ascertainable.

50. Frost's trade secrets include financial, business, technical, economic and customer information, including the identity of current, former and prospective customers and non-public information related to longstanding customer relationships, work on development of new customers, and company marketing and sale strategies for economic growth. Frost's trade secrets

also include customer bid information, pricing models, proposal response strategies and other information related to the procurement of customer contracts.

51. Frost has taken reasonable measures to safeguard its trade secrets. For instance, Frost and its predecessor implemented a confidentiality agreement that employees with access to confidential information must execute as a condition of employment. This confidentiality agreement expressly prohibits disclosure of confidential business information and trade secrets to third parties without Frost's authorization. Moore executed a confidentiality agreement as a condition of his employment.

52. Frost has also implemented a policy of safeguarding its systems with password protections to further safeguard its trade secrets. Specifically, Frost and its predecessor require employees to maintain secret and secure network passwords to Frost systems, which limit access to trade secrets and confidential information stored on those systems to individual employees on a need-to-know basis.

53. Frost and its predecessor also implemented a policy of terminating access to confidential information at the conclusion of an individual's employment to further safeguard its trade secrets.

54. Moore has obtained an economic benefit from the theft of Frost's trade secrets, including the stealing of Frost's existing and prospective customers and business opportunities.

55. Moore used Frost's trade secrets to divert business away from Frost.

56. As a result of Moore's unlawful actions, Frost has suffered harm, including the loss of business, the loss of customer goodwill and the lost value derived from Frost and its predecessor's investment in a large amount of time and resources to develop proprietary and

11

confidential information that gives Frost an advantage over its competitors, in an amount to be determined at trial.

57. Frost has suffered irreparable harm due to Moore's ongoing violations of the Illinois Trade Secrets Act and will continue to do so unless Moore is enjoined from their wrongful conduct.

## COUNT III
### Breach of Confidentiality Agreement

58. Frost incorporates by reference all of the allegations contained in paragraphs 1-57 as if alleged in this paragraph.

59. On or around February 24, 2020, as a condition of his employment Moore entered into the Confidentiality Agreement.

60. The Confidentiality Agreement is a valid and enforceable contract, and is supported by valuable consideration, including but not limited to, hiring Moore as Regional Manager of Sales and Business Development and later Director of Sales.

61. In the Confidentiality Agreement, Moore agreed that he would refrain from using or disclosing the confidential information of Frost without authorization. Said agreement also required Moore to refrain from directly or indirectly soliciting any of Frost's clients or otherwise influencing them to direct any purchases of products or services away from Frost.

62. Notwithstanding the Confidentiality Agreement's non-solicitation provision, and in breach thereof, Moore resigned from Frost and, just two months later, began working for TAPCO, LLC, whereupon he used Frost's trade secrets and revealed confidential information in

an effort to solicit Frost's customers and persuade them to lessen their business with Frost. Further, Moore solicited potential customers and business opportunities from Frost.

63. Moore's actions have caused the unlawful diversion of customer business, prospective future customer business, profits and opportunities from Frost to TAPCO, LLC and other third-party competitors.

64. As a direct result of Moore's breach of the Confidentiality Agreement, Frost has suffered harm, including the loss of business and the diminution in value of Frost's confidential information, damaging Frost in an amount to be determined at trial.

65. Frost has suffered irreparable harm due to Moore's ongoing breach of the Confidentiality Agreement and will continue to do so unless Moore is enjoined from his wrongful conduct.

## COUNT IV
### Breach of Fiduciary Duty

66. Frost incorporates by reference all of the allegations contained in paragraphs 1-65 as if alleged in this paragraph.

67. As Director of Sales, Moore was a senior employee and agent of Frost, charged with important job duties regarding Frost's sales strategies, customer relationships and procurement plans.

68. As a senior employee and agent of Frost, Moore had a duty to not use Frost's trade secrets, confidential information and other property for his own purposes.

69. As a senior employee and agent of Frost, Moore had a duty to not acquire a material benefit from existing or perspective customers at the expense of Frost.

70. As a senior employee and agent of Frost, Moore had a duty to not take steps to unlawfully compete against Frost.

71. Moore, in the months immediately following his resignation from Frost, breached his fiduciary duties to Frost by secretly usurping Frost's business opportunities, strategies, customers and valuable property, and using these assets to compete against Frost.

72. Moore's actions were not conducted in good faith.

73. As a direct result of Moore's actions, Frost has suffered harm, including the loss of business and the diminution in value of Frost's confidential information, damaging Frost in an amount to be determined at trial.

74. Frost has suffered irreparable harm due to Moore's ongoing breach of his fiduciary duties and will continue to do so unless Moore is enjoined from his wrongful conduct.

## COUNT V
### Tortious Interference with Customers

75. Frost incorporates by reference all of the allegations contained in paragraphs 1-74 as if alleged in this paragraph.

76. Frost had entered into valid and enforceable business contracts with its customers, pursuant to which all parties to the contracts received consideration, and Frost has complied with its obligations under these contracts.

77. Moore was aware of Frost's contracts with its customers.

78. Moore has interfered with Frost's contracts with its customers.

79. Moore's interference with Frost's contracts with its customers has been wrongful and without justification.

80. Frost has suffered damages due to Moore's interference with Frost's contracts with its customers, in an amount to be determined at trial.

81. Frost has suffered irreparable harm due to the tortious interference of Moore with Frost's contracts with its customers, and will continue to do so unless Moore is enjoined from their wrongful conduct.

## COUNT VI
### Tortious Interference with Prospective Business Advantage

82. Frost incorporates by reference all of the allegations contained in paragraphs 1-81 as if alleged in this paragraph.

83. Frost has a legitimate expectation of future business with its customers.

84. Moore is aware of Frost's legitimate expectation of future business with its customers.

85. Moore has interfered with Frost's future business with its customers.

86. Moore's interference with Frost's future business with its customers has been wrongful and without justification.

87. Frost has suffered damages due to Moore's interference with Frost's future business with its customers, in an amount to be determined at trial.

88. Frost has suffered irreparable harm due to the tortious interference of Moore with Frost's future business with its customers, and will continue to do so unless Moore is enjoined from his wrongful conduct.

## COUNT VII
### Injunctive Relief

89. Frost incorporates by reference all of the allegations contained in paragraphs 1-88 as if alleged in this paragraph.

90. The interference clause of the Confidentiality Agreement states:

> Further, I agree that I shall not use any Confidential Information of the Company of the Company to influence any of the Company's clients or customers from purchasing Company products or services or to solicit or influence or attempt to influence any client, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company.

91. Moore is not adhering to the above interference clause and he is disseminating confidential information and trade secrets.

92. Moore is currently influencing and soliciting Frost's current clients and customers to purchase Frost's products and services from people, firms, corporations, institutions or other entities in direct competition with Frost.

93. Moore is using trade secret and confidential information and is disseminating it in the marketplace.

94. Frost is suffering irreparable harm as a result of Moore's conduct.

95. The Confidentiality Agreement that includes the interference clause was negotiated in good faith and Frost has fulfilled its obligations under the Agreement.

96. Moore is in breach of the interference clause by virtue of his efforts at influencing and soliciting Frost's current clients and customers to purchase Frost's products and services from people, firms, corporations, institutions or other entities in direct competition with Frost.

97. There is a likelihood that Frost will succeed on the merits of this claim.

**PRAYERS FOR RELIEF**

WHEREFORE, Plaintiff Frost Solutions, LLC, respectfully prays that this Court:

1. Enter judgment in its favor and against Moore under Count I, holding him liable for damages stemming from misappropriation of trade secrets under the Defend Trade Secrets Act, together with interest, costs, attorney's fees, and punitive damages; and enjoining Moore from using or disclosing any of Frost's trade secrets;

2. Enter judgment in its favor and against Moore under Count II, holding him liable for damages stemming from misappropriation of trade secrets under the Illinois Trade Secrets Act, together with interest, costs, attorney's fees, and punitive damages; and enjoining Moore from using or disclosing any of Frost's trade secrets;

3. Enter judgment in its favor and against Moore under Count III, holding him liable for damages stemming from breach of contract, together with interest, costs, attorney's fees, and punitive damages; and enjoining Moore from soliciting Frost's customers and prospective customers and from using Frost's confidential information.

4. Enter judgment in its favor and against Moore under Count IV, holding him liable for damages stemming from breach of his fiduciary duties, together with interest, costs, attorney's fees, and punitive damages; and enjoining Moore from soliciting Frost's customers and prospective customers and from using Frost's confidential information.

5. Enter judgment in its favor and against Moore under Count V, holding him liable for damages stemming from his tortious interference of Frost's customers, together with interest, costs, attorney's fees, and punitive damages; and enjoining Moore from continuing to tortiously interfere with Frost's customers.

6. Enter judgment in its favor and against Moore under Count VI, holding him liable for damages stemming from his tortious interference of Frost's prospective customers, together with interest, costs, attorney's fees, and punitive damages; and enjoining Moore from continuing to tortiously interfere with Frost's prospective customers.

7. Enter judgment in its favor and against Moore under Count VII, enjoining Moore from violating the interference clause and from influencing and soliciting Frost's current clients and customers to purchase Frost's products and services from people, firms, corporations, institutions or other entities in direct competition with Frost.

Plaintiff demands a trial by jury.

Dated: December 8, 2022.

                                                Respectfully Submitted,

                                                /s/Amir R. Tahmassebi
                                                Attorney for Plaintiff

Amir Tahmassebi (6287787)
Connor J. Whitting (6331565)
KONICEK & DILLON, P.C.
70 W. Madison St., Suite 2060
Chicago, IL 60602
(T) 630.262.9655 | (F) 630.262.9659
amir@konicekdillonlaw.com
connor@konicekdillonlaw.com