IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FROST SOLUTIONS, LLC, | |
| Plaintiff, | CASE NO.: 1:22-CV-06910 |
| vs. | Hon. J. Martha M. Pacold |
| CORY MOORE, | Hon. Mag. J. Jeffrey T. Gilbert |
| Defendant. | Jury Trial Demanded |

**DEFENDANT CORY MOORE'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION TO DISMISS THE AMENDED COMPLAINT**

## I.      INTRODUCTION

Despite having already amended its complaint, Frost Solutions, LLC ("Frost") has pled nothing more than conclusory allegations that Cory Moore ("Moore"), a former employee of its predecessor, Frost Control Systems Inc. ("Frost Control"), misappropriated trade secrets and confidential information. Relying on conclusory allegations is fatal to all claims: not only has Frost failed to plead the existence of a concrete trade secret, but it has also failed to provide any facts that support an allegation of misappropriation or any other wrongdoing. Further, Frost puts forward claims that are not only preempted, but that also contain no allegations—conclusory or otherwise—to support certain elements of the claims. And Frost's contract claim misstates that there is a general non-solicitation duty where the clause instead prohibits use of confidential information in aid of solicitation. In sum, Frost's "because I said so" approach does not satisfy Rule 8, or *Twombly* and its progeny, and Moore requests the Court dismiss the Amended Complaint with prejudice.

## II.     FACT ALLEGATIONS

The Amended Complaint allegations can be categorized as follows:

a.   <u>Mere background allegations regarding the parties and their relationship</u>

Frost alleges it is a manufacturer of a proprietary weather security product ("AIMS"), which it sells in the US and Canada and for which it provides support services. (Am. Compl. ¶¶ 13, 15, 16.) Frost was formed in June 2022 and purchased the assets of Frost Control in August of 2022, five months after Moore resigned from Frost Control. (*Id.* ¶¶ 4, 17.) Moore is a former employee of Frost Control, the predecessor to Frost, who resigned from Frost Control in March 2022 and joined another firm, TAPCO, no later than June 2022. (*Id.* ¶¶ 4, 7, 31.) TAPCO is a customer of Frost. (*Id.* ¶ 31.)

b.   <u>Allegations regarding the Confidential Information Agreement</u>

While employed with Frost Control, Moore entered into a Confidential Information and Invention Assignment Agreement, effective February 24, 2020—that is unsigned by Frost (the "Agreement"). (Am. Compl. Ex. 2.) The Agreement contains a provision entitled "Protection of Information" which provides that Moore will not use or disclose Frost Control's Confidential Information (as defined in the Agreement) "until such Confidential Information becomes publicly and widely known and made generally available . . . ." (*Id.* § 3(a).)

The Agreement also provides that upon termination, Moore shall sign a Termination Certification attached to the Agreement as Exhibit B. (*Id.* Ex. 2, § 6.) The Termination Certification provides that Moore acknowledges continuing obligations under the Agreement and that he will not use Confidential Information to influence clients or customers from purchasing Company products or services or solicit customers from purchasing products from any competitor of the Company. (*Id.* Ex. 2, Ex. B.) The Agreement does not contain a post-

termination client or customer non-solicit agreement, nor does it contain a non-compete agreement. (*Id.* Ex. 2.) Further, Exhibit B's prohibition against use of Confidential Information to solicit post-termination does not otherwise appear in the Agreement. (*Id.* Ex. 2.) The obligations in the Termination Certification are not supported by any additional consideration independent of that in the Agreement as a whole. (*Id.* Ex. 2, Ex. B.)

      c.   <u>Vague allegations regarding Frost's trade secrets</u>

Frost identifies two types of trade secrets: (1) its proprietary technology, including AIMS (weather platform), and related information, software, and systems (*Id.* ¶¶ 14, 20); and (2) a laundry list of high-level, broad and vague categories:

> trade secrets include financial, business, technical, economic and customer information, including the identity of current, former and prospective customers and non-public information relating to long-standing customer relationships, customer purchasing history and financial information, work on development of new customers and company marketing and sales strategies for economic growth.

(*Id.* ¶ 19.) Beyond naming these general categories of information, Frost makes no allegations regarding the particular trade secrets at issue.

      d.   <u>Allegations regarding Frost's confidential information lifted from the Agreement</u>

Frost relies on the Agreement's definition of Confidential Information, which defines the term as "any and all information and physical manifestations thereof not generally known or available outside the Company and information and physical manifestations thereof entrusted to the Company in confidence by third parties, whether or not such information is patentable, copyrightable or otherwise legally protectable." (Am. Compl. Ex. 2, § 3(b).) The Agreement then goes on to provide broad-based categories of information that constitute Confidential Information. (*Id.*) In the Amended Complaint, Frost emphasizes the following categories in the Agreement:

lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

(*Id.* ¶ 24.) Frost's Amended Complaint repeats this same laundry list taken from the Agreement

(*id.* ¶ 31) but does not otherwise allege the Confidential Information at issue.

> e. <u>Allegations regarding alleged misappropriation and wrongdoing</u>

The few allegations that discuss Moore's alleged wrongdoing in the Factual Background

section of the Amended Complaint are conclusory or based on Frost's "belief" or "suspicion":

- "Moore began using Frost's trade secrets, customer lists and confidential information to solicit customers." (Am. Compl. ¶ 3.)

- "Moore interfered with Frost's business relationships by diverting accounts held by Frost. Moore began soliciting Frost's customers, and it is believed he has succeeded in obtaining the business of at least one or more of Frost's customers." (*Id.* ¶ 30.)

- "Frost had reason to believe that Moore began soliciting Frost's customers to conduct business with competitors of Frost's. Frost suspected that Moore may have used Frost's trade secrets and confidential information . . . in order to solicit Frost's customers." (*Id.* ¶ 31.)

- "Given the above, coupled with the fact that Moore played a role that has caused certain Frost business relationships to sever and begin to establish business relationships with competitors, it is believed that Moore has been disclosing Frost's confidential information and trade secrets, and will continue to do so to the detriment of Frost and in violation of Moore's continuing contractual obligations to Frost." (*Id.* ¶ 33.)

Similarly, Frost provides no additional information in the Count-specific allegations, and

only makes conclusory statements of wrongdoing in an attempt to satisfy the elements of the

claims. (*Id.* ¶¶ 42, 43, 54, 55, 62, 71, 78, 91-93.)

Based on these conclusory allegations, Frost asserts seven claims against Moore:

(1) Violation of the Defend Trade Secrets Act ("DTSA"); (2) Violation of the Illinois Trade

Secrets Act ("ITSA"); (3) Breach of Confidentiality Agreement; (4) Breach of Fiduciary Duty;

4

(5) Tortious Interference with Customers; (6) Tortious Interference with Prospective Business Advantage; and (7) Injunctive Relief.

### III.    LEGAL STANDARD

To survive a motion to dismiss, a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). Though the Court must assume that well-pled allegations are true, conclusory allegations are "not entitled to th[at] assumption." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A complaint that contains only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. A complaint must "suggest that the plaintiff has a right to relief . . . above a 'speculative' level." *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007). Where allegations are plead "upon information and belief," a complaint must be dismissed where "factual detail in support of [an] otherwise conclusory allegation is entirely missing." *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 917 (7th Cir. 2013). Otherwise, such allegations are "wholly conclusory." *Id.*

### IV.    ARGUMENT

### 1.    All claims must be dismissed because they are based on conclusory allegations unsupported by any facts (Claims 1-7).

For all seven causes of action, the Amended Complaint contains no facts in support of the claims, and thus fails to meet the pleading requirements of *Twombly* and its progeny. A complaint must provide "fair notice" of the claim and basis for it. *Twombly*, 550 U.S. at 555. To provide such fair notice, the complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Boucher v. Fin. Sys. of Green Bay, Inc.*, 880 F.3d 362, 366 (7th Cir. 2018) (citation omitted). This "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at

678. Importantly, "The notice-pleading rule 'does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.'" *Jump Buffalo Grove, LLC. v. Cincinatti Cas. Co.*, 572 F. Supp. 3d 460, 465 (N.D. Ill. 2021) (quoting *Iqbal*, 556 U.S. at 678-79).

Despite this clear pleading standard, Frost provides no facts to support the narrative that Moore has engaged in wrongdoing. Boiled down, Frost's allegations center around the conclusion that Moore used Frost's confidential information and trade secrets to solicit clients, thus constituting violations of state and federal trade secret law, interference with contracts and business relationships, breach of contract, and a breach of fiduciary duty. (*See e.g.*, Am. Compl. ¶¶ 2, 30, 31, and 33.) However, Frost provides no facts whatsoever to support that allegation, and provides no notice to Moore, or the Court, of the basis of its claims. Nor is solicitation apparent from the relationship of the parties as described by Frost, which has pled that Moore is currently employed by one of Frost's customers. (*Id*. ¶ 31.).

Even the statements Frost makes on "belief" or "suspicion" are not beliefs or suspicions regarding underlying facts, but rather are believed or suspected conclusions that Frost used confidential information and trade secrets to solicit clients. (*See id*. ¶ 33 ("[I]t is *believed* that Moore has been disclosing Frost's confidential information and trade secrets") and ¶ 31 ("Frost had reason to *believe* that Moore began soliciting Frost's customers to conduct business with competitors of Frost's. Frost *suspected* that Moore *may have used* Frost's trade secrets and confidential information in order to solicit Frost's customers.") (emphasis added).) Frost provides no facts that underly this belief of wrongdoing, thus such statements are "wholly conclusory" and cannot state a claim. *Yeftich*, 722 F.3d at 917. As such, Frost is "armed with nothing more than conclusions" and each of its claims are based solely on "unadorned, [Moore]-

6

unlawfully-harmed-me accusation[s]." Therefore, the entire Amended Complaint must be dismissed.

### 2. The DTSA and ITSA claims are unsupported by allegations of specific trade secrets and misappropriation and must be dismissed (Counts 1 and 2).

The Court should dismiss the statutory trade secret claims for the additional reason that Frost has not plead the existence of a misappropriated trade secret with sufficient specificity.

The DTSA creates a private cause of action in favor of the "owner of a trade secret that is misappropriated…if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." *Segerdahl Corp. v. Ferruzza*, No. 17 cv 3015, 2018 WL 828062, at *2 (N.D. Ill. Feb. 10, 2018) (citing 18 U.S.C. § 1836(b)(1)). Similarly, under the ITSA, the plaintiff must show that the information at issue was a trade secret, misappropriated, and used in the defendant's business. *Thermal Zone Prods. Corp. v. Echo Eng'g, Ltd.*, No. 93 C 0556, 1993 WL 358148, at *5 (N.D. Ill. Sept. 14, 1993). Courts in this District generally analyze DTSA and ITSA claims together. *See LQD Bus. Fin., LLC v. Rose*, No. 19 C 4416, 2022 WL 4109715, at *3 (N.D. Ill. Sept. 8, 2022) (dismissing ITSA and DTSA claims and stating, "The statutes are, in relevant part, virtually identical, so the Court will reference only the ITSA.").

As a threshold matter, Frost has failed to identify a trade secret. To state a plausible claim for trade secret misappropriation, a plaintiff must plead the allegedly misappropriated trade secrets with sufficient specificity. *See Segerdahl*, 2018 WL 828062, at *3. It is not enough for a plaintiff to "point to broad areas of [information]…and assert that something there must have been secret and misappropriated. The plaintiff must show concrete secrets." *Carpenter v. Aspen Search Advisers, LLC*, No. 10 C 6823, 2011 WL 1297733, at *3 (N.D. Ill. Apr. 5, 2011) (quoting *Composite Marine Propellers, Inc. v. Van Der Woude*, 962 F.2d 1263, 1266 (7th Cir. 1992)). While a plaintiff need not compromise its trade secrets, defendants "are entitled to be able to

discern what trade secrets are at issue." *Chatterplug, Inc. v. Digital Intent, LLC*, No. 1:16-cv-4056, 2016 WL 6395409, at *3 (N.D. Ill. Oct. 28, 2016). A plaintiff cannot "leave[ ] mysterious exactly which pieces of information are the trade secrets." *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002). Further, the Seventh Circuit has "warned plaintiffs of the risks they run by failing to identify specific trade secrets and instead producing long lists of general areas of information which contain unidentified trade secrets." *AMP Inc. v. Fleischhacker*, 823 F.2d 1199, 1203 (7th Cir. 1987), *superseded on other grounds*.

However, that is exactly what Frost does. Frost has defined its trade secrets as an unexclusive laundry list of categories such as "financial, business, technical, economic and customer information," "information relating to long-standing customer relationships" and "marketing and sales strategies," among similar allegations. (Am. Compl. ¶ 19; *see also id.* ¶¶ 38, 50.) Frost also defines its trade secrets as "proprietary technology, including AIMS" and information associated with AIMS, including "information about product design and development." (*Id.* ¶ 20.) Such "broad areas" are neither concrete nor specific enough to constitute trade secrets, and do not allow Moore or the court to properly "discern what [items] are at issue." *Carpenter*, 2011 WL 1297733, at *3; *Chatterplug*, 2016 WL 6395409, at *3.

Indeed, Frost's allegations align with the cases that have found the alleged identification too broad to adequately plead a trade secret. *See Segerdahl*, 2018 WL 828062, at *3 (allegation of "confidential information...pertaining to Segerdahl's business and the sale thereof" was too broadly defined); *Carpenter*, 2011 WL 1297733, at *3 (dismissing claim containing only non-specific allegations regarding the nature of the alleged trade secrets); *Chatterplug*, 2016 WL 6395409, at *3 (dismissing complaint where plaintiff failed to provide the "general contours" of the alleged trade secrets); *Thermal Zone Prods.*, 1993 WL 358148, at *5-6 (allegations of

"technical information, including drawings, plans, and specifications for the manufacture of their [cooking] ovens" was too broad). As such, the DTSA and ITSA claims must be dismissed.

As described in Section IV.1, *supra*, Frost also fails to tie the trade secrets to the misappropriation allegation. *See Segerdahl*, 2018 WL 828062, at *3 (dismissing complaint where plaintiff did not connect alleged trade secrets to misappropriation). Frost's theory of misappropriation seems to be based on the idea that it is losing business, and so Moore must have taken or misused its trade secrets, despite pleading no facts that support this conclusion. This "because I said so" approach is insufficient to show misappropriation, and so the ITSA and DTSA claims should be dismissed for this additional reason.

### 3. The ITSA preempts Frost's common law tort claims (Counts 4-6).

The "ITSA is the exclusive remedy under Illinois law for misappropriation of trade secrets." *AutoMed Techs., Inc. v. Eller*, 160 F. Supp. 2d 915, 921 (N.D. Ill. 2001) (citing 765 ILCS 1065/8(a)). The ITSA abolishes common law claims, other than breach of contract, based on or arising from misappropriation of trade secrets. *Hecny Transp., Inc. v. Chu,* 430 F.3d 402, 404 (7th Cir. 2005); *Fox Controls, Inc. v. Honeywell, Inc.*, No. 02 C 346, 2002 WL 1949723, at *2 (N.D. Ill. Aug. 22, 2002). "In other words, if the operative facts are arguably cognizable under the ITSA, any common law claim that might have been available on those facts in the past now no longer exists in Illinois." *Fox Controls*, 2002 WL 1949723, at *3. Importantly, "[w]hether or not an ITSA claim is supported, the Act preempts related common law claims." *Carpenter*, 2011 WL 1297733, at *2.

Frost's breach of fiduciary duty (Count 4), tortious interference with customers (Count 5), and tortious interference with prospective business advantage (Count 6) claims are all premised on a trade secret theory – Frost alleges that Moore misappropriated its confidential

9

information and trade secrets. (Am. Compl. ¶¶ 5, 33, 73.) Courts have held in numerous instances that the ITSA preempts these types of claims where, as here, they are based on a misappropriation of trade secrets. *See, e.g. Fox Controls*, 2002 WL 1949723, at *2-3 (preemption of tortious interference with prospective business advantage and breach of fiduciary duty claims when plaintiff alleged defendant used confidential and proprietary information); *AutoMed Techs.*, 160 F. Supp. 2d at 922 (preemption of breach of fiduciary duty claim based on defendant allegedly using confidential information to compete against his former employer); *Westrock Co. v. Dillon*, 21-cv-05388, 2021 WL 6064038, at *23 (N.D. Ill. Dec. 22, 2021) (preemption of tortious interference with contracts and prospective business claims based on former employee allegedly using trade secrets and confidential information to solicit customers); and *Carpenter*, 2011 WL 1297733, at *2 (breach of fiduciary claim preempted because it arose from defendant's access to confidential data). As such, Counts 4-6 are preempted and should be dismissed.[1]

### 4. Frost's breach of contract claim fails because it is based on a non-existent non-solicitation provision, Exhibit B is not supported by independent consideration, and breach is based on insufficient allegations of misappropriation (Count 3).

Frost's breach of contract claim is based on the allegation that Moore "used Frost's trade secrets and revealed confidential information in an effort to solicit Frost's customers and persuade them to lessen their business with Frost. Further, Moore solicited potential customers and business opportunities from Frost." (Am. Compl. ¶ 62.)

---

[1] The Agreement contains a choice of law provision designating Indiana law for disputes regarding the performance of the Agreement, "all acts and transactions pursuant" to the Agreement, and the "rights and obligations of the parties" to the Agreement. Should this choice of law provision be construed broadly to incorporate statutory and common law claims, the ITSA claim should be dismissed for the independent reason that Indiana, rather than Illinois, trade secret law should apply. *See e.g. Gen. Elec. Co. v. Uptake Tech., Inc.*, 394 F. Supp. 3d 815, 830 (N.D. Ill. 2019) (discussing whether contractual choice of law provision applied to statutory and tort claims).

As a preliminary matter, the breach of contract claim contains allegations that are expressly belied by the contract. *See Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) ("When an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss.") Frost alleges that the Agreement "required Moore to refrain from directly or indirectly soliciting any of Frost's clients or otherwise influencing them to direct any purchases of products or services away from Frost," and that Moore breached the agreement by soliciting potential customers and business relations. (Am. Compl. ¶¶ 61, 62.) However, the only portion of the Agreement that even mentions the non-solicitation of customers is Exhibit B, the Termination Certification. The unambiguous terms of the certification provide only that Moore will not use any Confidential Information to solicit clients or influence them to do business with a competitor; it does not contain a broader non-solicitation or non-interference provision. (*Id*. Ex. 2, Ex. B.)

Nor is the Termination Certification's prohibition on using Confidential Information to solicit clients supported by additional consideration. These obligations are found in Exhibit B to the Agreement only, not in the Agreement itself. As such, they constitute additional, post-termination terms that are not supported by consideration. *See Schlumberger Well Servs., a Div. of Schlumberger Tech. Corp. v. Baker*, 623 F. Supp. 1310, 1311, 1314-15 (S.D. Ind. 1985) (finding that termination agreements with restrictive covenants must be supported by more than what the employee was already entitled to). Thus, such purported obligation is invalid, and the breach of contract claim cannot stand.

Furthermore, the remaining allegations pertaining to breach of the confidentiality obligations in the Agreement are simply a restatement of Frost's allegations regarding misappropriation of trade secrets and confidential information, which, as explained in Section

11

IV.1, *supra*, are insufficient to show wrongdoing. When breach of contract is premised on misappropriation, as it is here, failure to establish misappropriation similarly defeats a claim for breach of contract. *See Maxtech Consumer Prods., Ltd. v. Robert Bosch Tool Corp.*, 255 F. Supp. 3d 833, 855 (N.D. Ill. 2017).

5. **Frost fails to allege any pre-termination conduct that could support a claim for breach of fiduciary duty, and so this claim should be dismissed (Count 4).**

Frost's breach of fiduciary duty claim is based entirely on the conclusory allegation that "in the months immediately following his resignation from Frost" Moore breached his fiduciary duties to Frost. However, it is well-established that an employee's fiduciary duty ends "once the employment relationship ends." *V.I.M. Recyclers, L.P. v. Magner*, 271 F. Supp. 2d 1072, 1075 (N.D. Ill. 2003); *see also Potts v. Review Bd. of Ind. Emp. Sec. Div.*, 475 N.E.2d 708, 712 (Ind. App. 1985) (noting the "well-settled rule . . . that a former employee may compete with his employer after the termination . . ."). Thus, the fiduciary duty claim fails not only because of Frost's failure to allege facts constituting wrongdoing, but because even its conclusory allegations of wrongdoing fail to support a claim for breach since they all relate to conduct following the termination of the employment relationship. Thus, the claim should be dismissed.

6. **Frost fails to allege facts supporting its claim for tortious interference with customers (Count 5) and provides no allegation that Moore induced a third party to breach its contract with Frost, and so this claim fails.**

While Frost styles Count five as a claim for "Tortious Interference with Customers," it pleads that Frost had contracts with clients with which Moore interfered, and so the claim should be treated as a tortious interference with a contract claim. The elements of tortious interference with a contract are "(1) the existence of a valid and enforceable contract between the plaintiff and a third party, (2) that defendant was aware of the contract, (3) that defendant intentionally and unjustifiably induced a breach of the contract, (4) that the wrongful conduct of defendant

caused a subsequent breach of the contract by the third party, and (5) that plaintiff was damaged as a result." *Bank Fin., FSB v. Brandwein*, 36 N.E.3d 421, ¶ 43 (Ill. App. 1st Dist. 2015).

As stated in Section IV.1, *supra*, Frost has not sufficiently alleged any wrongdoing on Moore's part. Notwithstanding this pleading deficiency, Frost makes another fatal pleading deficiency in failing to allege that Moore induced a third party into breaching its contract with Frost. As a preliminary matter, Frost does not identify the specific contracts that exist between it and its customers, let alone plead allegations regarding the terms of those contracts or even the subject matter of those contracts. It only makes a conclusory allegation that it has "valid and enforceable business contracts with its customers," that Moore knew about those contracts, and that Moore interfered with them wrongfully and unjustifiably (Am. Compl. ¶¶ 76-79.) This is not sufficient to plead the first three elements of the claim.

Further, Frost does not even make a conclusory allegation that Moore interfered with a contract in such a way that caused the customer to breach their contract with Frost (element 4). Such omission is fatal. *See Israel v. Nat'l Can. Corp.*, 658 N.E.2d 1184, 1193 (Ill. App. 1st Dist. 1995) (holding complaint that did not allege a third party to breach its contract with plaintiff "could not conceivably state a cause of action" for tortious interference with a contract.) The tortious interference with a contract claim should be dismissed for this independent reason.[2]

---

[2] The same is true in Indiana. "To state a claim for tortious interference with a contract, a plaintiff must allege 1) the existence of a valid and enforceable contract, 2) the defendant's knowledge of the existence of the contract, 3) **the defendant's intentional inducement of breach of the contract**, 4) the absence of justification, and 5) damages resulting from the defendant's wrongful inducement of the breach." *Morgan Asset Holding Corp. v. CoBank, ACB*, 736 N.E.2d 1268, 1272 (Ind. App. 2000) (dismissing tortious interference with a contract claim for failure to allege conduct "was intended for the sole purpose of causing injury and damage" to plaintiff) (emphasis added).

### 7. Frost fails allege facts that show Moore acted with the purpose of injuring Frost's expectancies, and so the tortious interference with prospective business advantage claim (Count 6) fails.

In Illinois, the elements of a claim for tortious interference with prospective economic or business advantage are: (1) plaintiff must have a reasonable expectancy of entering into a valid business relationship; (2) defendant must know about the expectancy; (3) defendant must intentionally interfere with the expectancy and cause a breach or termination of the expectancy, and (4) damage to plaintiff resulting from defendant's interference. *Frain Grp., Inc. v. Steve's Frozen Chillers,* No. 14 C 7097, 2015 WL 1186131, at *4 (N.D. Ill. Mar. 10, 2015).

To sufficiently plead the first element, "a plaintiff must identify a specific third party with whom he expected to enter into a business relationship." *Nat'l Auto Parts, Inc. v. Automart Nationwide, Inc.*, No. 14 C 8160, 2015 WL 5693594, at *7 (N.D. Ill. Sept. 24, 2015); *Kapotas v. Better Gov't Ass'n*, 30 N.E.3d 572, ¶ 80 (Ill. App. 1st Dist. 2015). A plaintiff also must "take the necessary step of identifying any individuals or companies who refused to do business with plaintiff because of [a defendant's] alleged interference." *Fine Line Distribs. v. Rymer Meats, Inc.*, No. 93 C 5685, 1994 WL 282299, at *4 (N.D. Ill. June 22, 1994). "Without any concrete claims that a reasonable expectation of doing business with any particular individual or company has been defeated, [a plaintiff] has not satisfied the elements of the intentional interference tort." *Dynabest, Inc. v. Yao*, 760 F. Supp. 704, 713 (N.D. Ill. 1991).

Further, to sufficiently plead the third element, the claim "must set forth facts which suggest that defendant acted with the purpose of injuring plaintiff's expectancies." *Kapotas*, 30 N.E.3d 572, ¶ 80. Conclusory allegations are not enough to create an inference that defendant "acted with the purposes of injuring plaintiff's expectancies." *Id.* at ¶ 81.[3]

---

[3] The same is true in Indiana. "Tortious interference with business relationships and prospective advantages requires: (1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship;

Nowhere in the Amended Complaint does Frost provide any factual allegations, or even a conclusory allegation that Moore acted with the purpose of injuring Frost's expectancies. The only change Moore made to the Amended Complaint is that he now alleges the customer it contends Moore interfered with is TAPCO, Moore's current employer. No further allegations of wrongdoing by Moore were added, other than the conclusory statement that "upon information and belief" Moore steered TAPCO to Frost's competitors. (Am. Compl. ¶ 85.) There are no facts alleged that Moore acted with the intent of harming Frost's interests, or allegations as to how Moore might have done so. As such the tortious interference with prospective business advantage claim fails and must be dismissed for that additional reason.

**8. Injunctive Relief (Count 7) is a remedy not a cause of action.**

Frost's last count for injunctive relief is not a claim at all, but instead a form of relief and so must be dismissed. "An injunction is a type of remedy…as distinct from an underlying claim for relief." *Onyango v. Downtown Ent.*, *LLC*, 525 F. App'x 458, 460 (7th Cir. 2013); *see also Sieving v. Cont'l Cas. Co.*, 535 F. Supp. 3d 762, 774-75 (N.D. Ill. 2021) (dismissing claim for declaratory and injunctive relief because both are "not independent causes of action").

**V. CONCLUSION**

For all the reasons stated, Moore respectfully requests that this Court dismiss Frost's Amended Complaint in its entirety and with prejudice.

---

(3) **the defendant's intentional interference with that relationship**; (4) the absence of justification; (5) damages resulting from defendant's wrongful interference with the relationship; and (6) illegal conduct." *Landeen v. PhoneBILLit, Inc.*, 519 F. Supp. 2d 844, 869 (S.D. Ind. 2007) (emphasis added). Further, Indiana law requires illegal conduct on behalf of the defendant, which Frost does not allege. *Id.*

Dated this 21st day of August, 2023.    By:  */s/Maria L. Kreiter*

Maria L. Kreiter, *admitted pro hac vice*
Christie B. Carrino, *admitted pro hac vice*
GODFREY & KAHN, S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202-5615
414-273-3500
mkreiter@gklaw.com
ccarrino@gklaw.com

Erik J. Ives
FOX SWIBEL LEVIN & CARROLL LLP
200 W. Madison Street, Suite 3000
Chicago, IL 60606
312-224-1200
eives@foxswibel.com

*Attorneys for Defendant Cory Moore*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that, on August 21, 2023, she caused the foregoing document to be electronically filed with the Clerk of the United States District Court for the Northern District of Illinois, Eastern Division, using the Court's CM/ECF system, which is also served upon counsel for all parties of record.

/s/Maria L. Kreiter
Maria L. Kreiter

29810435.1

17