UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FROST SOLUTIONS, LLC,<br><br>                Plaintiff,<br><br>v.<br><br>CORY MOORE and TRAFFIC AND PARKING CONTROL CO., INC.,<br><br>                Defendants. | Case No. 1:22-CV-06910<br><br>District Judge Martha M. Pacold<br><br>Magistrate Judge Jeffrey T. Gilbert |

## SECOND AMENDED COMPLAINT

Plaintiff Frost Solutions, LLC ("Frost"), by and through its attorneys, submits this Second Amended Complaint against Defendants Cory Moore and Traffic and Parking Control Co., Inc. ("TAPCO"), alleging as follows:

### NATURE OF THE ACTION

1. This action seeks damages arising from Moore's breach of certain obligations to Frost imposed by contractual, post-employment restrictive covenants and fiduciary duties, and Moore's and TAPCO's tortious inference with Frost's contractual relationships and its prospective economic advantages, and related wrongful acts.

2. Moore executed a Confidentiality Agreement prior to and as a condition of his employment with Plaintiff Frost's predecessor in interest, Frost Control Systems, Inc. ("Frost Control"), on or around February 24, 2020. The Confidentiality Agreement prohibited Moore from disclosing Frost Control's (or its successors') proprietary information, including, among other things, information relating to Frost Control's suppliers, customers, price lists, marketing plans, business plans, and financial data.

3. Moore resigned from his position as Director of Sales for Frost Control on or around late March of 2022. A few months later, Moore began working for TAPCO.

4. After resigning, Moore wrongfully retained and began using Frost's confidential information to solicit its customers, with encouragement of and assistance from TAPCO.

5. By using Frost's confidential information to directly compete against Plaintiff Frost, Moore is liable for breaching his contractual and fiduciary duties to Frost. Moore and TAPCO are liable for tortiously interfering with Frost's contracts and its prospective economic advantages, and for their civil conspiracy to commit these tortious acts with the intent of harming Frost and its business.

**THE PARTIES**

6. Plaintiff Frost Solutions, LLC is a limited liability company organized under the laws of Delaware. The sole member of Frost Solutions, LLC is Clashmore Ventures, LLC, whose two members are Michael Kirsh and Michael Bott. Both Kirsh and Bott reside in Illinois. Thus, Frost Solutions, LLC is a citizen of Illinois.

7. Moore is an individual and the former Director of Sales for Frost Control. Moore is a resident of Grand Rapids, Michigan. Thus, Moore is a citizen of Michigan.

8. TAPCO is a Wisconsin corporation with its principal place of business in Brown Deer, Wisconsin. Thus, TAPCO is a citizen of Wisconsin.

**JURISDICTION AND VENUE**

9. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). Complete diversity exists between the parties and the amount in controversy exceeds $75,000.

10. The Court has supplemental jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1367, as each of the claims in this action are so closely related that they form part of the same case or controversy.

11. This Court has personal jurisdiction over Moore, as he conducts business and sales in Illinois.

12. This Court has personal jurisdiction over TAPCO, as it conducts business and sales in Illinois.

13. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b)(2), as a substantial portion of the acts, omissions, and transactions giving rise to Frost's injuries occurred in this district and division.

## FACTUAL BACKGROUND

### Frost's business

14. Plaintiff Frost (and its predecessor Frost Control) is an innovative manufacturer and seller of a proprietary weather-security product called the Advanced Infrared Monitoring System ("AIMS").

15. AIMS is a fully-integrated, wireless weather platform that empowers operators with the information needed about weather conditions so they can make real-time operational decisions. AIMS provides operators with high-definition imagery and night vision, accurate weather atmospherics, forecasting, and pavement temperature. AIMS is accessible via mobile web or desktop applications, so operators can monitor road conditions throughout the country from virtually anywhere.

16. Frost sells its trusted weather monitoring products, including the proprietary AIMS technology, in 35 states and 7 Canadian provinces.

3

17. Frost also provides safe, reliable, and cost-effective services for customers who use its AIMS technology, including support, repairs, and analytics.

18. Frost Control was originally formed in October 2017 as "Frost Control Systems, LLC," a limited liability company organized under the laws of Indiana. In early 2019, the entity became "Frost Control Systems, Inc.," a Delaware corporation with its principal place of business in South Bend, Indiana. For a time, Frost Control did business under the name "Frost Technologies."

19. Plaintiff Frost was formed as a limited liability company on June 2, 2022. It became registered to conduct business in Illinois on July 12, 2022. On August 9, 2022, Plaintiff Frost purchased all of the assets of Frost Control, including, without limitation, all contract rights, general intangibles, customer lists, claims, and intellectual property. As such, Plaintiff Frost became a successor to certain assets and rights of Frost Control, including the Confidentiality Agreement discussed below and all claims relating to this action.

20. Plaintiff Frost and its predecessor, Frost Control, have spent years and millions of dollars in developing their business and expertise in the weather-security industry, and developing confidential business information. Such confidential information gives Frost a competitive edge over its peers and competitors.

21. Frost's confidential business information includes financial, business, technical, economic, and customer information, including the identities of current, former, and prospective customers and non-public information relating to longstanding customer relationships, customer purchasing history, and financial information, work on development of new customers and company marketing, and sales strategies for economic growth.

22. Frost and its predecessor have taken reasonable measures to safeguard their

confidential business information. For instance, Frost and its predecessor implemented and utilized confidentiality agreements that employees are required to execute at the start of their employments, including the Confidentiality Agreement that Moore signed when he started with Frost Control.

23. These confidentiality agreements require, among other provisions, the assignment of rights to any invention made during an employee's time at Frost and non-disclosure of Frost's proprietary information, including information regarding suppliers and customers, price lists, marketing plans, business plans, and financial data.

24. Plaintiff Frost and its predecessor implemented a policy of terminating access to confidential information at the conclusion of an individual's employment to safeguard their confidential and proprietary information.

**Frost hires Moore**

25. In February 2020, Frost Control extended a written offer of employment to Moore by way of an offer letter. (**Ex. 1**.) The offer letter provided that Moore, upon accepting Frost Control's offer, would become Regional Manager of Sales and Business Development.

26. As a condition of employment, Moore was required to execute a Confidential and Invention Assignment Agreement (the "Confidentiality Agreement"). (**Ex. 2**.) The Confidentiality Agreement included a covenant restricting Moore's use of Frost Control's confidential business information. The clause states in pertinent part:

> **3.** **Confidential Information.**
>
> (a) **Protection of Information.** I understand that during the Relationship, the Company intends to provide me with certain information, including Confidential Information (as defined below), without which I would not be able to perform my duties to the Company. *At all times during*

5

*the term of the Relationship and thereafter*, I shall hold in strictest confidence, *and not use*, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, *and not disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance*, any Confidential Information that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item.

(b) **Confidential Information.** I understand that "Confidential Information" means any and all information and physical manifestations thereof not generally known or available outside the Company and information and physical manifestations thereof entrusted to the Company in confidence by third parties, whether or not such information is patentable, copyrightable or otherwise legally protectable. Confidential Information includes, without limitation: (i) Company Inventions (as defined below); and (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, *agreements with third parties*, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), *lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.*

(Ex. 2 at 1–2 (italicized emphases added).)

24. Exhibit B to the Confidentiality Agreement contained a "Termination Certification" describing Moore's obligations to Frost Control after the end of his employment with Frost Control.

25. The Termination Certification required Moore to return and relinquish

6

control of certain property belonging to Frost at the end of his employment, namely, "devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, flow charts, materials, equipment, other documents or property, or copies or reproductions of any aforementioned items." (*Id.* at 10.)

26. The Termination Certification further required Moore to "preserve as confidential" the following information belonging to Frost Control:

> all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

(*Id.*)

27. The Termination Certification also contained an interference clause prohibiting Moore from interfering with Frost's customer relationships or otherwise influencing them to direct any purchases of products or services away from Frost. The clause stated:

> Further, I agree that I *shall not use* any Confidential Information of the Company of the Company *to influence any of the Company's clients or customers* from purchasing Company products or services or to solicit or influence or attempt to influence any client, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity *in competition* with the business of the Company.

(*Id.* (italicized emphases added).)

28. Moore accepted the offer and executed the Confidentiality Agreement on February 24, 2020, including a separate signature on the Termination Certification.

7

29. After executing the Confidentiality Agreement, Moore had access to and made use of Frost's confidential information, including customer and prospective customer information, to perform his job duties for Frost Control. Moore also had access to Frost's longstanding customer relationships and internal business strategies.

30. After working for a time as Regional Manager of Sales and Business Development for Frost Control, Moore was promoted to Director of Sales.

**Moore resigns from Frost, joins TAPCO, and turns TAPCO into a competitor**

31. On or around March 22, 2022, Moore suddenly resigned his employment with Frost Control.

32. Shortly thereafter, Moore joined TAPCO as a National Account Executive.

33. TAPCO is a provider of traffic safety and parking solutions. Its customers include public entities and private businesses.

34. After resigning, Moore retained possession of confidential information belonging to Frost, in violation of the Confidentiality Agreement.

35. Upon information and belief, TAPCO hired Moore with knowledge of his former employment with Frost and his access to Frost's confidential information.

36. Shortly after Moore joined TAPCO, Moore interfered with Frost's existing business relationships and future business opportunities by using Frost's confidential information to divert and solicit Frost's current and prospective customers.

37. One such customer is TAPCO itself. TAPCO was originally a customer of Frost.

38. On December 29, 2021, TAPCO executed a blanket agreement with Frost

8

providing that TAPCO had the right to purchase up to 30 of Frost's AIMS units within an 18-month period. (**Ex. 3**.)

39. However, after Moore left Frost Control and joined TAPCO, Moore caused TAPCO to purchase competing products from Vue Robotics LLC, instead of from Frost. Moore did so using Frost's confidential information.

40. Vue Robotics is a direct competitor of Frost. Moore is an investor in Vue Robotics.

41. Indeed, despite the December 29, 2021 Purchase Order, to date, TAPCO has purchased only 15 AIMS units.

42. After joining TAPCO, Moore used Frost's confidential information to solicit other current and prospective customers of Frost to purchase competing products from Vue Robotics through TAPCO, producing a profit for both TAPCO and Vue Robotics. Moore personally benefitted from this conduct as an investor in Vue Robotics.

43. TAPCO has thus become a competitor of Frost for selling competing products.

44. TAPCO has benefited from Moore's misuse of Frost's confidential information by obtaining Frost's customers and business opportunities.

45. Upon information and belief, TAPCO encouraged and assisted Moore in soliciting Frost's customers and misusing Frost's confidential information for TAPCO's benefit.

**Moore discloses Frost's confidential information to divert customers from Frost**

46. Due to the niche nature of the AIMS and AIMS-related technology,

9

proprietary information regarding price lists, pricing models and methodologies, and market data is crucial to be able to obtain and maintain customers, and compete in the marketplace of weather-security products and services.

47. In his solicitation of Frost's current and prospective customers, Moore used Frost's confidential information, which includes but is not limited to lists of (or information relating to) suppliers and customers—including Frost customers Moore became familiar with or called on while working at Frost—price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets, and other business information disclosed to Moore by Frost during his employment with Frost.

48. For example, on or around July 5, 2022, a few months after Moore left Frost, Moore informed one of his colleagues at TAPCO that he had Frost's customer list and would use this information for TAPCO's benefit, stating: "I have all the prior customer list to attack/casually attack with our products[.]"

49. The same day, Moore also told the same TAPCO colleague that he "could bring over 1/3 of Frost Clients in 2022[.]"

50. Moore then continued to share with TAPCO and others the customer lists he used "in the past when [he] was at Frost" and even his "old notes" from Frost.

51. Moore then reached out to numerous Frost customers and contacts—using Frost's confidential to do so—to inform them about his resignation from Frost and to divert their business from Frost to TAPCO.

52. On or around July 18, 2022, Moore reached out to a customer in Portage, Michigan—a contact he obtained from Frost's confidential information—and solicited its business for TAPCO. This customer responded that it still had an active contract with

10

Frost, which Moore knew.

53. In October 2023, Moore emailed a Frost customer in Joliet, Illinois that had an active contract with Frost. When the customer responded that it was "locked in with Frost till 2025," Moore informed the customer that it "can opt out [of the Frost contract] with a 30 day notice[.]"

54. In addition to customer identities, details, and lists, Moore also used and disclosed Frost's confidential information regarding Frost's pricing of its products and services and the timing of its agreements with customers, that is, when the contracts would be up for renewal.

55. For example, on or around February 1, 2023, Moore expressly discussed "Frost pricing" and specifics regarding Frost's products and technology with his TAPCO colleagues.

56. Additionally, on February 7, 2024, TAPCO discussed a Frost customer that "currently uses Frost but Cory [Moore] keeps working on them to cancel out of their contract and go to Vue[.]"

**Frost learns of Moore's unlawful interference with its customers**

57. In or around June 2022, Frost learned that Moore had joined TAPCO.

58. On September 2, 2022, Frost's former counsel sent Moore a letter demanding that he cease from engaging in any unlawful interference with Frost's customer relationships. (**Ex. 4**.)

59. Moore was undeterred. Based on the communications above, Moore continued to solicit Frost's business and customers even after receiving this cease-and-desist letter.

11

## COUNT I
## Breach of Contract
## (Against Defendant Moore)

60. Frost restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

61. On or around February 24, 2020, as a condition of his employment, Moore entered into the Confidentiality Agreement.

62. The Confidentiality Agreement is a valid and enforceable contract, and is supported by valuable consideration, including but not limited to hiring Moore as Regional Manager of Sales and Business Development and later Director of Sales.

63. In the Confidentiality Agreement, Moore agreed that he would refrain from using or disclosing Frost's confidential business information without authorization.

64. Frost never authorized Moore to retain its confidential information or disclose it to TAPCO or any other third party after his employment with Frost ended.

65. The Confidentiality Agreement also required Moore to refrain from using Frost's confidential information to directly or indirectly solicit any of Frost's customers or otherwise influence them to direct any purchases of products or services away from Frost.

66. Frost performed its obligations under the Confidentiality Agreement.

67. Moore resigned from Frost and, in breach of the Confidentiality Agreement's terms, retained possession of Frost's confidential information.

68. Just two months later, Moore joined TAPCO and began using Frost's confidential information in an effort to solicit Frost's customers and persuade them to lessen

their business with Frost, in breach of the Confidentiality Agreement's terms. Further, Moore solicited potential customers and business opportunities from Frost.

69. Moore's actions have caused the unlawful diversion of customer business, prospective future customer business, profits, and opportunities from Frost to TAPCO and other third-party competitors of Frost.

70. As a direct and proximate result of Moore's breach of the Confidentiality Agreement, Frost has suffered harm, including the loss of business and the diminution in value of Frost's confidential information, damaging Frost in an amount to be determined at trial.

## COUNT II
### Breach of Fiduciary Duty
### (Against Defendant Moore)

71. Frost restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

72. Under the Confidentiality Agreement and by virtue of being a senior employee of Frost entrusted with access to Frost's confidential information, Moore was obligated to operate in good faith and also owed a duty of loyalty to Frost.

73. Moore breached these duties by unlawfully retaining possession of Frost's confidential information when he resigned from Frost.

74. As a direct and proximate result of Moore's breach of his duties, Frost suffered damages in an amount to be determined at trial.

## COUNT III
## Tortious Interference with Contracts
### (Against Defendants Moore and TAPCO)

75. Frost restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

76. Frost had entered into valid and enforceable business contracts with its customers, pursuant to which all parties to the contracts received consideration, and Frost has complied with its obligations under these contracts.

77. Defendants Moore and TAPCO knew of the contractual relationships between Frost and its customers.

78. Using Frost's confidential information, Defendants intentionally and unjustifiably interfered with Frost's contracts with its customers, including but not limited to inducing Frost's customers to breach their contracts with Frost.

79. Defendants' interference with Frost's contracts with its customers was wrongful and without justification.

80. As a direct and proximate result of Defendants' interference with Frost's contracts with its customers, Frost has suffered damages in an amount to be determined at trial.

## COUNT IV
## Tortious Interference with Prospective Economic Advantages
### (Against Defendants Moore and TAPCO)

81. Frost restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

82. Frost had a legitimate and reasonable expectation of entering into valid

business relationships with its current and prospective customers.

83. Defendants Moore and TAPCO had knowledge of Frost's expectancies through, among other things, Moore's prior position as Director of Sales for Frost Control and the confidential business information belonging to Frost that he wrongfully retained after resigning his employment with Frost.

84. Defendants intentionally interfered with Frost's expectations by using Frost's confidential information to improperly solicit Frost's current and prospective customers. Additionally, Moore interfered with Frost's future business with TAPCO itself.

85. Defendants' interference prevented Frost's legitimate expectancies from ripening into valid business relationships.

86. Defendants' interference with Frost's future business with its current and prospective customers was wrongful and without justification.

87. As a direct and proximate result of Defendants' interference with Frost's future business with its current and prospective customers, Frost has suffered damages in an amount to be determined at trial.

### COUNT V
### Civil Conspiracy
### (Against Defendants Moore and TAPCO)

88. Frost restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

89. In engaging in the above conduct, Defendants conspired to commit various torts against Frost with the intent to misappropriate its relationships with customers and prospective customers.

15

90. In furtherance of this agreement, Defendants committed several overt acts, including but not limited to the following: Moore disclosed Frost's confidential information to TAPCO; TAPCO hired Moore with knowledge of his access to Frost's confidential information; Defendants used Frost's confidential information to identify and target Frost's customers and prospective customers; Defendants jointly developed strategies to solicit Frost's customers using Frost's confidential information; and Defendants coordinated their efforts to divert business from Frost to TAPCO and other competitors of Frost.

91. In engaging in the foregoing conduct, Defendants acted with actual malice to Frost.

92. As a direct and proximate result of Defendants' conspiracy and over acts, Frost has suffered damages, including but not limited to lost business, lost profits, and damage to its customer relationships, in an amount to be determined at trial.

93. Defendants' conduct was willful, wanton, and malicious, justifying an award of punitive damages.

## COUNT VI
### Unjust Enrichment
### (Against Defendant Moore and in the alternative to Count I)

94. Frost restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, except paragraphs 60–70.

95. Moore has received the benefit of Frost's confidential information.

96. Moore's retention and use of Frost's confidential information was to Frost's detriment.

97. Moore was receiving commissions and/or a salary from Frost while unjustly

enriching himself through his unlawful retention (and subsequent use and distribution) of Frost's confidential information and breaches of his fiduciary duty.

98. Moore was unjustly enriched because, among other things, Moore was able to build goodwill for himself and Frost's competitors at Frost's expense.

99. Moore's retention of these benefits would be unjust and unfair.

## JURY DEMAND

100. Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

Wherefore, Plaintiff Frost Solutions, LLC respectfully requests that this Court:

A. Enter judgment in Plaintiff's favor and against Defendant Moore under Count I, holding him liable for damages stemming from his breaches of the Confidentiality Agreement;

B. Enter judgment in Plaintiff's favor and against Defendant Moore under Count II, holding him liable for damages stemming from his breaches of his fiduciary duties to Frost;

C. Enter judgment in Plaintiff's favor and against Defendants Moore and TAPCO under Count III, holding them liable for damages stemming from their tortious interference with Plaintiff Frost's contracts with its customers;

D. Enter judgment in Plaintiff's favor and against Defendants Moore and TAPCO under Count IV, holding them liable for damages stemming from their tortious interference with Plaintiff Frost's reasonable expectations of future business with its current and prospective customers;

17

E. Enter judgment in Plaintiff's favor and against Defendants Moore and TAPCO under Count V, holding them liable for damages stemming from their civil conspiracy to commit tortious acts to harm Frost and its business;

F. In the alternative to Count I, enter judgment in Plaintiff's favor and against Defendant Moore under Count VI, holding that Moore must disgorge all monies, profits, and gains he has obtained or will unjustly obtain in the future at the expense of Plaintiff Frost, and imposing a constructive trust thereof for the benefit of Plaintiff Frost;

G. Issue an order enjoining Defendants from retaining or possessing Frost's confidential business information or using Frost's confidential business information to solicit Frost's current or prospective customers;

H. Award Plaintiff its reasonable attorney's fees and associated costs;

I. Award Plaintiff punitive damages;

J. Award Plaintiff prejudgment and postjudgment interest; and

K. Grant such other and further relief as the Court may deem to be just and appropriate.

Dated: October 7, 2024

Respectfully submitted,

**FROST SOLUTIONS, LLC**

*/s/ Benjamin S. Morrell*
Todd A. Rowden
James L. Oakley

Benjamin S. Morrell
Yeoeun C. Yoon
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Tel: (312) 527-4000
Fax: (312) 527-4011
Email: trowden@taftlaw.com
joakley@taftlaw.com
bmorrell@taftlaw.com
yyoon@taftlaw.com

Amir R. Tahmassebi (6287787)
Connor J. Whitting (6331565)
KONICEK & DILLON, P.C.
70 W. Madison St., Suite 2060
Chicago, IL 60602
(T) 630.262.9655 | (F) 630.262.9659
amir@konicekdillonlaw.com
connor@konicekdillonlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically served copies of the foregoing document and exhibits thereto on all counsel of record via the Court's CM/ECF system, pursuant to Fed. R. Civ. P. 5(b)(2)(E).

Dated: October 7, 2024 /s/ *Benjamin S. Morrell*