IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FROST SOLUTIONS, LLC, | |
| Plaintiff, | CASE NO.: 1:22-CV-06910 |
| vs. | Hon. J. Martha M. Pacold |
| CORY MOORE and | Hon. Mag. J. Jeffrey T. Gilbert |
| TRAFFIC AND PARKING CONTROL CO., INC., | |
| Defendants. | |

## DEFENDANTS CORY MOORE AND TRAFFIC AND PARKING CONTROL CO., INC.'S ANSWER AND AFFIRMATIVE DEFENSES TO SECOND AMENDED COMPLAINT

Defendants Cory Moore ("Moore") and Traffic and Parking Control Co., Inc. ("TAPCO"), collectively ("Defendants") answer Plaintiff Frost Solutions, LLC's ("Frost") Second Amended Complaint and assert affirmative defenses as follows.

### NATURE OF THE ACTION

1. This action seeks damages arising from Moore's breach of certain obligations to Frost imposed by contractual, post-employment restrictive covenants and fiduciary duties, and Moore's and TAPCO's tortious inference with Frost's contractual relationships and its prospective economic advantages, and related wrongful acts.

**ANSWER NO. 1:** Defendants admit that Frost is seeking the damages it identifies in paragraph 1. Defendants deny all remaining allegations, deny that they engaged in any alleged misconduct, and deny that Frost is entitled to any relief.

2. Moore executed a Confidentiality Agreement prior to and as a condition of his employment with Plaintiff Frost's predecessor in interest, Frost Control Systems, Inc. ("Frost Control"), on or around February 24, 2020. The Confidentiality Agreement pro-hibited Moore from disclosing Frost Control's (or its successors') proprietary infor-mation, including, among other things, information relating to Frost Control's suppliers, customers, price lists, marketing plans, business plans, and financial data.

**ANSWER NO. 2:** Defendants admit that Moore signed the Confidentiality Information and Invention Assignment Agreement attached to the Second Amended Complaint as Exhibit 2

("Confidentiality Agreement") on or around February 24, 2020. That Confidentiality Agreement speaks for itself, and Defendants deny the allegations in paragraph 2 to the extent inconsistent with the Confidentiality Agreement. Defendants deny the remaining allegations in paragraph 2.

3.  Moore resigned from his position as Director of Sales for Frost Control on or around late March of 2022. A few months later, Moore began working for TAPCO.

**ANSWER NO. 3:** Defendants admits the allegations in paragraph 3. Defendants state that Moore worked for a third-party for a number of months after resigning from Frost Control and thereafter Moore commenced employment at TAPCO.

4.  After resigning, Moore wrongfully retained and began using Frost's confi-dential information to solicit its customers, with encouragement of and assistance from TAPCO.

**ANSWER NO. 4:** Defendants deny.

5.  By using Frost's confidential information to directly compete against Plain-tiff Frost, Moore is liable for breaching his contractual and fiduciary duties to Frost. Moore and TAPCO are liable for tortiously interfering with Frost's contracts and its pro-spective economic advantages, and for their civil conspiracy to commit these tortious acts with the intent of harming Frost and its business.

**ANSWER NO. 5:** Defendants deny.

### THE PARTIES

6.  Plaintiff Frost Solutions, LLC is a limited liability company organized un-der the laws of Delaware. The sole member of Frost Solutions, LLC is Clashmore Ventures, LLC, whose two members are Michael Kirsh and Michael Bott. Both Kirsh and Bott reside in Illinois. Thus, Frost Solutions, LLC is a citizen of Illinois.

**ANSWER NO. 6:** Defendants lack information sufficient to form a belief as to the truth of the allegations and deny on that basis.

7.  Moore is an individual and the former Director of Sales for Frost Control. Moore is a resident of Grand Rapids, Michigan. Thus, Moore is a citizen of Michigan.

**ANSWER NO. 7:** Defendants admit.

8. TAPCO is a Wisconsin corporation with its principal place of business in Brown Deer, Wisconsin. Thus, TAPCO is a citizen of Wisconsin.

**ANSWER NO. 8:** Defendants admit.

## JURISDICTION AND VENUE

9. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a). Complete diversity exists between the parties and the amount in contro-versy exceeds $75,000.

**ANSWER NO. 9:** Defendants admit.

10. The Court has supplemental jurisdiction over the claims in this action pur-suant to 28 U.S.C. § 1367, as each of the claims in this action are so closely related that they form part of the same case or controversy.

**ANSWER NO. 10:** Defendants deny and affirmatively allege supplemental jurisdiction is

moot because there is no federal question.

11. This Court has personal jurisdiction over Moore, as he conducts business and sales in Illinois.

**ANSWER NO. 11:** Defendants admit.

12. This Court has personal jurisdiction over TAPCO, as it conducts business and sales in Illinois.

**ANSWER NO. 12:** Defendants admit.

13. Venue is proper in this district and division pursuant to 28 U.S.C. § 1391(b)(2), as a substantial portion of the acts, omissions, and transactions giving rise to Frost's injuries occurred in this district and division.

**ANSWER NO. 13:** Defendants deny.

3

## FACTUAL BACKGROUND

### Frost's business

14. Plaintiff Frost (and its predecessor Frost Control) is an innovative manufac-turer and seller of a proprietary weather-security product called the Advanced Infrared Monitoring System ("AIMS").

**ANSWER NO. 14:** Defendants admit that Frost sells (and its predecessor Frost Control sold) a product called AIMS. Defendants lack knowledge and information sufficient to form a belief as to the truth of the remaining allegations and deny the remaining allegations on that basis. Defendants specifically deny that the products of Frost and Frost Control are "innovative" given the similar products available in the market.

15. AIMS is a fully-integrated, wireless weather platform that empowers oper-ators with the information needed about weather conditions so they can make real-time operational decisions. AIMS provides operators with high-definition imagery and night vision, accurate weather atmospherics, forecasting, and pavement temperature. AIMS is accessible via mobile web or desktop applications, so operators can monitor road condi-tions throughout the country from virtually anywhere.

**ANSWER NO. 15:** Defendants admit that AIMS is intended to be used by operators monitoring road conditions. Defendants lack knowledge and information sufficient to form a belief as to the truth of the remaining allegations in paragraph 15 and deny the remaining allegations on that basis.

16. Frost sells its trusted weather monitoring products, including the proprie-tary AIMS technology, in 35 states and 7 Canadian provinces.

**ANSWER NO. 16:** Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 16 and deny the allegations on that basis.

17. Frost also provides safe, reliable, and cost-effective services for customers who use its AIMS technology, including support, repairs, and analytics.

**ANSWER NO. 17:** Defendants lack knowledge and information sufficient to form a belief

4

as to the truth of the allegations in paragraph 17 and deny the allegations on that basis.

18. Frost Control was originally formed in October 2017 as "Frost Control Sys-tems, LLC," a limited liability company organized under the laws of Indiana. In early 2019, the entity became "Frost Control Systems, Inc.," a Delaware corporation with its principal place of business in South Bend, Indiana. For a time, Frost Control did business under the name "Frost Technologies."

**ANSWER NO. 18:** Defendants admit that Frost Control did business under the name

"Frost Technologies." As to the remaining allegations in paragraph 18, Defendants lack knowledge

and information sufficient to form a belief as to the truth of those allegations and deny those

allegations on that basis.

19. Plaintiff Frost was formed as a limited liability company on June 2, 2022. It became registered to conduct business in Illinois on July 12, 2022. On August 9, 2022, Plaintiff Frost purchased all of the assets of Frost Control, including, without limitation, all contract rights, general intangibles, customer lists, claims, and intellectual property. As such, Plaintiff Frost became a successor to certain assets and rights of Frost Control, including the Confidentiality Agreement discussed below and all claims relating to this action.

**ANSWER NO. 19:** Defendants admit on information and belief that Frost was formed as

a limited liability company on June 2, 2022, became registered to conduct business in Illinois on

July 12, 2022, and was party to an asset purchase agreement on August 9, 2022. Defendants deny

all remaining allegations.

20. Plaintiff Frost and its predecessor, Frost Control, have spent years and mil-lions of dollars in developing their business and expertise in the weather-security indus-try, and developing confidential business information. Such confidential information gives Frost a competitive edge over its peers and competitors.

**ANSWER NO. 20:** Defendants lack knowledge and information sufficient to form a belief

as to the truth of the allegations in paragraph 20, and deny the allegations on that basis.

21. Frost's confidential business information includes financial, business, tech-nical, economic, and customer information, including the identities of current, former, and prospective customers and non-public information relating to longstanding customer rela-tionships, customer purchasing history, and financial information, work on development of new customers and company marketing, and sales strategies for economic growth.

5

**ANSWER NO. 21:** Defendants deny.

22. Frost and its predecessor have taken reasonable measures to safeguard their confidential business information. For instance, Frost and its predecessor implemented and utilized confidentiality agreements that employees are required to execute at the start of their employments, including the Confidentiality Agreement that Moore signed when he started with Frost Control.

**ANSWER NO. 22:** Defendants admit Moore signed the Confidentiality Agreement and that it is dated February 24, 2020, which was on or around when Moore started at Frost Control. Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 22 regarding the execution of Confidentiality Agreements by employees of Frost Control or Frost besides Moore and deny the allegations on that basis. Defendants deny Frost and Frost Control took reasonable measures to safeguard their alleged confidential information, much of which is publicly available and/or is distributed to customers without any protection.

23. These confidentiality agreements require, among other provisions, the as-signment of rights to any invention made during an employee's time at Frost and non-disclosure of Frost's proprietary information, including information regarding suppliers and customers, price lists, marketing plans, business plans, and financial data.

**ANSWER NO. 23:** Defendants state that the Confidentiality Agreement Moore signed speaks for itself, and deny the allegations to the extent they are inconsistent with that document. Defendants lack knowledge and information sufficient to form a belief as to the truth of the remaining allegations in paragraph 23 and deny the allegations on that basis.

24. Plaintiff Frost and its predecessor implemented a policy of terminating ac-cess to confidential information at the conclusion of an individual's employment to safe-guard their confidential and proprietary information.

**ANSWER NO. 24:** Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 24 and deny the allegations on that basis.

**Frost hires Moore**

25.  In February 2020, Frost Control extended a written offer of employment to Moore by way of an offer letter. (Ex. 1.) The offer letter provided that Moore, upon ac-cepting Frost Control's offer, would become Regional Manager of Sales and Business De-velopment.

**ANSWER NO. 25:**  Moore admits. TAPCO admits on information and belief.

26.  As a condition of employment, Moore was required to execute a Confiden-tial and Invention Assignment Agreement (the "Confidentiality Agreement"). (Ex. 2.) The Confidentiality Agreement included a covenant restricting Moore's use of Frost Control's confidential business information. The clause states in pertinent part:

### 3.  Confidential Information.

(a)  **Protection of Information.** I understand that during the Re-lationship, the Company intends to provide me with certain information, including Confidential Information (as defined below), without which I would not be able to perform my duties to the Company. At *all times during the term of the Relationship and thereafter*, I shall hold in strictest confidence, and not use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, *and not disclose to any person, firm, corporation or other entity, without written authori-zation from the Company in each instance*, any Confidential Information that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes pub-licly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item.

(b)  **Confidential Information.** I understand that "Confidential In-formation" means any and all information and physical manifestations thereof not generally known or available outside the Company and infor-mation and physical manifestations thereof entrusted to the Company in confidence by third parties, whether or not such information is patentable, copyrightable or otherwise legally protectable. Confidential Information in-cludes, without limitation: (i) Company Inventions (as defined below); and (ii) technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, in-ventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, *agreements with third parties*, lists of, or information relating to, employees and consultants of the Com-pany (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), *lists of, or information relating to, suppliers and customers (including, but not limited to, cus-tomers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or other business information disclosed to me by*

7

*the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.*
(Ex. 2 at 1–2 (italicized emphases added).)

**ANSWER NO. 26:** Defendants admit that paragraph 26 contains an accurate quotation of the portion of the Confidentiality Agreement. Defendants deny the remaining allegations of paragraph 26.

24.   Exhibit B to the Confidentiality Agreement contained a "Termination Cer-tification" describing Moore's obligations to Frost Control after the end of his employ-ment with Frost Control.

**ANSWER NO. 24 (#2, misnumbered):** Defendants admit that the Confidentiality Agreement contained an Exhibit B titled "Termination Certification." Defendants deny the remaining allegations of paragraph 24 (#2, misnumbered).

25.   The Termination Certification required Moore to return and relinquish control of certain property belonging to Frost at the end of his employment, namely, "de-vices, records, data, notes, reports, proposals, lists, correspondence, specifications, draw-ings, blueprints, sketches, laboratory notebooks, flow charts, materials, equipment, other documents or property, or copies or reproductions of any aforementioned items." (Id. at 10.)

**ANSWER NO. 25 (#2, misnumbered):** Defendants admit that paragraph 25 (#2, misnumbered) contains an accurate quotation of the Termination Certification. Defendants deny the remaining allegations of paragraph 25 (#2, misnumbered).

26.   The Termination Certification further required Moore to "preserve as con-fidential" the following information belonging to Frost Control:

> all trade secrets, confidential knowledge, data or other proprietary infor-mation relating to products, processes, know-how, designs, formulas, de-velopmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial infor-mation or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

(*Id.*)

**ANSWER NO. 26 (#2, misnumbered):** Defendants admit that paragraph 26 (#2,

misnumbered) contains an accurate quotation of the Termination Certification. Defendants

deny the remaining allegations of paragraph 26 (#2, misnumbered).

27. The Termination Certification also contained an interference clause prohib-iting
Moore from interfering with Frost's customer relationships or otherwise influencing them to direct
any purchases of products or services away from Frost. The clause stated:

> Further, I agree that I shall not use any Confidential Information of the Com-
> pany of the Company to influence any of the Company's clients or customers
> from purchasing Company products or services or to solicit or influence or
> attempt to influence any client, customer or other person either directly or
> indirectly, to direct any purchase of products and/or services to any person,
> firm, corporation, institution or other entity in competition with the business
> of the Company.

(*Id.* (italicized emphases added).)

**ANSWER NO. 27:** Defendants admit that paragraph 27 contains an accurate quotation of

the Termination Certification. Defendants deny the remaining allegations of paragraph 27.

28. Moore accepted the offer and executed the Confidentiality Agreement on February 24,
2020, including a separate signature on the Termination Certification.

**ANSWER NO. 28:** Defendants admit Moore accepted the job offer and that the

Confidentiality Agreement is dated February 24, 2020. Defendants further admit that Moore's

signature appears on the Termination Certification. Defendants affirmatively allege that the

signature is dated February 24, 2020 on or around Moore's acceptance of employment rather than

on or around the date of his resignation from Frost Control. Defendants deny the remaining

allegations of paragraph 28 and that the Termination Certification is binding on Moore or

enforceable.

29. After executing the Confidentiality Agreement, Moore had access to and made use of
Frost's confidential information, including customer and prospective cus-tomer information, to
perform his job duties for Frost Control. Moore also had access to Frost's longstanding customer
relationships and internal business strategies.

**ANSWER NO. 29:** Moore admits that he had access to Frost Control resources such as

customer and prospective customer information while he worked at Frost Control to perform his job duties for Frost Control. Moore denies the remaining allegations in paragraph 29, including but not limited to, the allegation that he had access to confidential information. TAPCO lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 29 and denies the allegations on that basis.

30. After working for a time as Regional Manager of Sales and Business Devel-opment for Frost Control, Moore was promoted to Director of Sales.

**ANSWER NO. 30:** Moore admits he worked for a time as the regional manager of sales and business development for Frost Control and, later, as its director of sales. Moore denies he was promoted. TAPCO lacks knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 30 and denies the allegations on that basis.

### Moore resigns from Frost, joins TAPCO, and turns TAPCO into a competitor

31. On or around March 22, 2022, Moore suddenly resigned his employment with Frost Control.

**ANSWER NO. 31:** Defendants admit Moore resigned from Frost Control on or around March 22, 2022. Defendants deny the remaining allegations and characterizations in paragraph 31.

32. Shortly thereafter, Moore joined TAPCO as a National Account Executive.

**ANSWER NO. 32:** Defendants admit Moore subsequently became employed at TAPCO. Defendants lack knowledge and information sufficient to form a belief as to the truth of the characterization of "Shortly thereafter," and deny the allegations on that basis. Defendants state that Moore worked for a third-party for a period of time after he resigned from Frost Control.

33. TAPCO is a provider of traffic safety and parking solutions. Its customers include public entities and private businesses.

**ANSWER NO. 33:** Defendants admit.

34. After resigning, Moore retained possession of confidential information be-longing to Frost, in violation of the Confidentiality Agreement.

**ANSWER NO. 34:** Defendants deny.

35. Upon information and belief, TAPCO hired Moore with knowledge of his former employment with Frost and his access to Frost's confidential information.

**ANSWER NO. 35:** Defendants deny and affirmatively allege Moore was never employed by Frost. Moore previously worked for Frost Control.

36. Shortly after Moore joined TAPCO, Moore interfered with Frost's existing business relationships and future business opportunities by using Frost's confidential in-formation to divert and solicit Frost's current and prospective customers.

**ANSWER NO. 36:** Defendants deny.

37. One such customer is TAPCO itself. TAPCO was originally a customer of Frost.

**ANSWER NO. 37:** Defendants deny.

38. On December 29, 2021, TAPCO executed a blanket agreement with Frost providing that TAPCO had the right to purchase up to 30 of Frost's AIMS units within an 18-month period. (Ex. 3.)

**ANSWER NO. 38:** Defendants deny. TAPCO affirmatively alleges that on or around December 29, 2021 it executed a blanket agreement with Frost Control, and that agreement is attached as Exhibit 3 to this Second Amended Complaint.

39. However, after Moore left Frost Control and joined TAPCO, Moore caused TAPCO to purchase competing products from Vue Robotics LLC, instead of from Frost. Moore did so using Frost's confidential information.

**ANSWER NO. 39:** Defendants deny.

40. Vue Robotics is a direct competitor of Frost. Moore is an investor in Vue Robotics.

**ANSWER NO. 40:** Defendants admit Moore is an investor in Vue Robotics. Defendants lack knowledge and information sufficient to form a belief as to the truth of the remaining allegations in paragraph 40 and deny the allegation son that basis.

11

41. Indeed, despite the December 29, 2021 Purchase Order, to date, TAPCO has purchased only 15 AIMS units.

**ANSWER NO. 41:** Defendants admit TAPCO purchased certain AIMS unit from Frost Control. Defendants deny the remaining allegations and characterizations contained in paragraph 41, including that its purchases were "despite" the purchase order. TAPCO affirmatively alleges that it had no obligation to purchase any number of AIMS units under the blanket purchase order with Frost Control, which states "No obligation to take ownership of material."

42. After joining TAPCO, Moore used Frost's confidential information to solicit other current and prospective customers of Frost to purchase competing products from Vue Robotics through TAPCO, producing a profit for both TAPCO and Vue Robotics. Moore personally benefitted from this conduct as an investor in Vue Robotics.

**ANSWER NO. 42:** Defendants admit that Moore solicited customers to purchase Vue Robotics products through TAPCO, for a profit to TAPCO and Vue Robotics. Defendants deny the remaining allegations of paragraph 42.

43. TAPCO has thus become a competitor of Frost for selling competing prod-ucts.

**ANSWER NO. 43:** Defendants deny.

44. TAPCO has benefited from Moore's misuse of Frost's confidential infor-mation by obtaining Frost's customers and business opportunities.

**ANSWER NO. 44:** Defendants deny.

45. Upon information and belief, TAPCO encouraged and assisted Moore in soliciting Frost's customers and misusing Frost's confidential information for TAPCO's benefit.

**ANSWER NO. 45:** Defendants deny.

**Moore discloses Frost's confidential information to divert customers from Frost**

46. Due to the niche nature of the AIMS and AIMS-related technology, proprietary information regarding price lists, pricing models and methodologies, and market data is crucial to be able to obtain and maintain customers, and compete in the marketplace of weather-security products and services.

12

**ANSWER NO. 46:**  Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 46 and deny the allegations on that basis.

47.  In his solicitation of Frost's current and prospective customers, Moore used Frost's confidential information, which includes but is not limited to lists of (or infor-mation relating to) suppliers and customers—including Frost customers Moore became familiar with or called on while working at Frost—price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets, and other business information dis-closed to Moore by Frost during his employment with Frost.

**ANSWER NO. 47:**  Defendants deny.

48.  For example, on or around July 5, 2022, a few months after Moore left Frost, Moore informed one of his colleagues at TAPCO that he had Frost's customer list and would use this information for TAPCO's benefit, stating: "I have all the prior customer list to attack/casually attack with our products[.]"

**ANSWER NO. 48:**  Defendants admit that Moore sent an email in July of 2022 that contains the quotation contained in paragraph 48. Defendants deny the remaining allegations and characterizations of paragraph 48 and specifically deny that Moore had Frost's customer list or that the allegations regarding the quotation are complete or accurately reflect the import of the relevant July 2022 exchange.

49.  The same day, Moore also told the same TAPCO colleague that he "could bring over 1/3 of Frost Clients in 2022[.]"

**ANSWER NO. 49:**  Defendants admit that Moore sent an email on or around July 5, 2022 that contains the quotation contained in paragraph 49. Defendants deny the remaining allegations and characterizations of paragraph 49 and specifically deny that the allegations regarding the quotation are complete or reflect the import of the relevant July 5, 2022 exchange.

50.  Moore then continued to share with TAPCO and others the customer lists he used "in the past when [he] was at Frost" and even his "old notes" from Frost.

**ANSWER NO. 50:**  Defendants deny. Defendants affirmatively allege that the "old notes"

13

quote comes from an e-mail Moore authored at TAPCO that refers to old notes authored by TAPCO employees that list TAPCO customers and/or prospects that Moore did not work with at Frost Control.

51.  Moore then reached out to numerous Frost customers and contacts—using Frost's confidential to do so—to inform them about his resignation from Frost and to di-vert their business from Frost to TAPCO.

**ANSWER NO. 51:**  Defendants deny and affirmatively allege that Moore never was an employee of Frost and so he never resigned from Frost. Moore further affirmatively alleges he reached out to certain former Frost Control customers to inform them about his resignation from Frost Control. Defendants deny the remaining allegations.

52.  On or around July 18, 2022, Moore reached out to a customer in Portage, Michigan — a contact he obtained from Frost's confidential information—and solicited its business for TAPCO. This customer responded that it still had an active contract with Frost, which Moore knew.

**ANSWER NO. 52:**  Defendants admit that in July 2022, as a TAPCO employee, Moore corresponded with a customer in Portage, Michigan, who informed Moore the City of Portage had a year remaining on its contract with Frost. Defendants deny the remaining allegations and characterizations in paragraph 52 and specifically deny that the allegations reflect the import of the relevant July 2022 exchange.

53.  In October 2023, Moore emailed a Frost customer in Joliet, Illinois that had an active contract with Frost. When the customer responded that it was "locked in with Frost till 2025," Moore informed the customer that it "can opt out [of the Frost contract] with a 30 day notice[.]"

**ANSWER NO. 53:**  Defendants admit that in October 2023 Moore emailed a contact in Joliet, Illinois and that the quotations replicated in paragraph 53 appear in the email chain between Moore and the customer. Defendants deny the remaining allegations and characterizations in paragraph 53 and specifically deny that the allegations regarding the quotation are complete or

14

reflect the import of the relevant exchange.

54. In addition to customer identities, details, and lists, Moore also used and disclosed Frost's confidential information regarding Frost's pricing of its products and services and the timing of its agreements with customers, that is, when the contracts would be up for renewal.

**ANSWER NO. 54**: Defendants deny.

55. For example, on or around February 1, 2023, Moore expressly discussed "Frost pricing" and specifics regarding Frost's products and technology with his TAPCO colleagues.

**ANSWER NO. 55**: Defendants admit that on or around February 1, 2023 Moore sent an email that contains the quotation replicated in paragraph 55. Defendants deny the remaining allegations and characterizations in paragraph 55 and specifically deny that the allegations regarding the quotation are complete or reflect the import of the relevant exchange, including that "Frost pricing" refers to the pricing of Frost Solutions, not Frost Controls. Moore was only privy to the pricing of Frost Controls during his employment with Frost Controls. The pricing of Frost Solutions differs from Frost Controls and is known in the market due to Frost Solutions disclosing its pricing to customers and otherwise without any effort to protect the information as confidential.

56. Additionally, on February 7, 2024, TAPCO discussed a Frost customer that "currently uses Frost but Cory [Moore] keeps working on them to cancel out of their con-tract and go to Vue[.]"

**ANSWER NO. 56**: TAPCO admits that on or around February 7, 2024 a TAPCO employee sent an email that contains the quotation replicated in paragraph 56. Moore lacks knowledge or information sufficient to form a belief as to the truth of this allegation and denies the allegation on that basis. Defendants deny the remaining allegations and characterizations in paragraph 56 and specifically deny that the allegations regarding the quotation are complete or reflect the import of the relevant exchange.

**Frost learns of Moore's unlawful interference with its customers**

57. In or around June 2022, Frost learned that Moore had joined TAPCO.

**ANSWER NO. 57:** Defendants lack knowledge and information sufficient to form a

belief about the truth of the allegations in paragraph 57 and deny the allegations on that basis.

58. On September 2, 2022, Frost's former counsel sent Moore a letter demand-ing that he cease from engaging in any unlawful interference with Frost's customer rela-tionships. (Ex. 4.)

**ANSWER NO. 58:** Defendants admit.

59. Moore was undeterred. Based on the communications above, Moore con-tinued to solicit Frost's business and customers even after receiving this cease-and-desist letter.

**ANSWER NO. 59:** Defendants deny.

**COUNT I**
**Breach of Contract**
**(Against Defendant Moore)**

60. Frost restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

**ANSWER NO. 60:** Defendants repeat and incorporate their responses to the allegations

in paragraphs 1 through 59.

61. On or around February 24, 2020, as a condition of his employment, Moore entered into the Confidentiality Agreement.

**ANSWER NO. 61:** Defendants admit Moore entered into the Confidentiality Agreement

and that it is dated February 24, 2020. Defendants deny the remaining allegations of paragraph

61.

62. The Confidentiality Agreement is a valid and enforceable contract, and is supported by valuable consideration, including but not limited to hiring Moore as Re-gional Manager of Sales and Business Development and later Director of Sales.

**ANSWER NO. 62:** Defendants deny.

16

63. In the Confidentiality Agreement, Moore agreed that he would refrain from using or disclosing Frost's confidential business information without authorization.

**ANSWER NO. 63:** The Confidentiality Agreement speaks for itself, and Defendants deny the allegations in paragraph 63 to the extent inconsistent with the Confidentiality Agreement.

64. Frost never authorized Moore to retain its confidential information or dis-close it to TAPCO or any other third party after his employment with Frost ended.

**ANSWER NO. 64:** Defendants deny and affirmatively allege Moore was never employed by Frost.

65. The Confidentiality Agreement also required Moore to refrain from using Frost's confidential information to directly or indirectly solicit any of Frost's customers or otherwise influence them to direct any purchases of products or services away from Frost.

**ANSWER NO. 65:** The Confidentiality Agreement speaks for itself, and Defendants deny the allegations in paragraph 65 to the extent inconsistent with the Confidentiality Agreement.

66. Frost performed its obligations under the Confidentiality Agreement.

**ANSWER NO. 66:** Defendants deny.

67. Moore resigned from Frost and, in breach of the Confidentiality Agree-ment's terms, retained possession of Frost's confidential information.

**ANSWER NO. 67:** Defendants deny and affirmatively allege that Moore was never employed by and so never resigned from Frost.

68. Just two months later, Moore joined TAPCO and began using Frost's confi-dential information in an effort to solicit Frost's customers and persuade them to lessen their business with Frost, in breach of the Confidentiality Agreement's terms. Further, Moore solicited potential customers and business opportunities from Frost.

**ANSWER NO. 68:** Defendants admit that Moore joined TAPCO in June of 2022 after resigning from Frost in March of 2022. Defendants deny the remaining allegations in paragraph

68.

69. Moore's actions have caused the unlawful diversion of customer business, prospective future customer business, profits, and opportunities from Frost to TAPCO and other third-party competitors of Frost.

**ANSWER NO. 69:** Defendants deny.

70. As a direct and proximate result of Moore's breach of the Confidentiality Agreement, Frost has suffered harm, including the loss of business and the diminution in value of Frost's confidential information, damaging Frost in an amount to be deter-mined at trial.

**ANSWER NO. 70:** Defendants deny.

**COUNT II**
**Breach of Fiduciary Duty**
**(Against Defendant Moore)**

71. Frost restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

**ANSWER NO. 71:** Defendants repeat and incorporate their responses to the allegations

in paragraphs 1 through 70.

72. Under the Confidentiality Agreement and by virtue of being a senior em-ployee of Frost entrusted with access to Frost's confidential information, Moore was ob-ligated to operate in good faith and also owed a duty of loyalty to Frost.

**ANSWER NO. 72:** Defendants deny.

73. Moore breached these duties by unlawfully retaining possession of Frost's confidential information when he resigned from Frost.

**ANSWER NO. 73:** Defendants deny.

74. As a direct and proximate result of Moore's breach of his duties, Frost suf-fered damages in an amount to be determined at trial.

**ANSWER NO. 74:** Defendants deny.

## COUNT III
### Tortious Interference with Contracts
### (Against Defendants Moore and TAPCO)

75. Frost restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

**ANSWER NO. 75:** Defendants repeat and incorporate their responses to the allegations in paragraphs 1 through 74.

76. Frost had entered into valid and enforceable business contracts with its cus-tomers, pursuant to which all parties to the contracts received consideration, and Frost has complied with its obligations under these contracts.

**ANSWER NO. 76:** Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 76 and deny the allegations on that basis.

77. Defendants Moore and TAPCO knew of the contractual relationships be-tween Frost and its customers.

**ANSWER NO. 77:** Defendants deny.

78. Using Frost's confidential information, Defendants intentionally and unjus-tifiably interfered with Frost's contracts with its customers, including but not limited to inducing Frost's customers to breach their contracts with Frost.

**ANSWER NO. 78:** Defendants deny.

79. Defendants' interference with Frost's contracts with its customers was wrongful and without justification.

**ANSWER NO. 79:** Defendants deny.

80. As a direct and proximate result of Defendants' interference with Frost's contracts with its customers, Frost has suffered damages in an amount to be determined at trial.

**ANSWER NO. 80:** Defendants deny.

## COUNT IV
### Tortious Interference with Prospective Economic Advantages
### (Against Defendants Moore and TAPCO)

81. Frost restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

**ANSWER NO. 81:** Defendants repeat and incorporate their responses to the allegations in paragraphs 1 through 80.

82. Frost had a legitimate and reasonable expectation of entering into valid business relationships with its current and prospective customers.

**ANSWER NO. 82:** Defendants lack knowledge and information sufficient to form a belief as to the truth of the allegations in paragraph 82 and deny the allegations on that basis.

83. Defendants Moore and TAPCO had knowledge of Frost's expectancies through, among other things, Moore's prior position as Director of Sales for Frost Control and the confidential business information belonging to Frost that he wrongfully retained after resigning his employment with Frost.

**ANSWER NO. 83:** Defendants deny.

84. Defendants intentionally interfered with Frost's expectations by using Frost's confidential information to improperly solicit Frost's current and prospective cus-tomers. Additionally, Moore interfered with Frost's future business with TAPCO itself.

**ANSWER NO. 84:** Defendants deny.

85. Defendants' interference prevented Frost's legitimate expectancies from ripening into valid business relationships.

**ANSWER NO. 85:** Defendants deny.

86. Defendants' interference with Frost's future business with its current and prospective customers was wrongful and without justification.

**ANSWER NO. 86:** Defendants deny.

87. As a direct and proximate result of Defendants' interference with Frost's future business with its current and prospective customers, Frost has suffered damages in an amount to be determined at trial.

20

**ANSWER NO 87:** Defendants deny.

## COUNT V
## Civil Conspiracy
## (Against Defendants Moore and TAPCO)

88. Frost restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint.

**ANSWER NO. 88:** Defendants repeat and incorporate their responses to the allegations

in paragraphs 1 through 87.

89. In engaging in the above conduct, Defendants conspired to commit various torts against Frost with the intent to misappropriate its relationships with customers and prospective customers.

**ANSWER NO. 89:** Defendants deny.

90. In furtherance of this agreement, Defendants committed several overt acts, including but not limited to the following: Moore disclosed Frost's confidential infor-mation to TAPCO; TAPCO hired Moore with knowledge of his access to Frost's confi-dential information; Defendants used Frost's confidential information to identify and tar-get Frost's customers and prospective customers; Defendants jointly developed strategies to solicit Frost's customers using Frost's confidential information; and Defendants coor-dinated their efforts to divert business from Frost to TAPCO and other competitors of Frost.

**ANSWER NO. 90:** Defendants deny.

91. In engaging in the foregoing conduct, Defendants acted with actual malice to Frost.

**ANSWER NO. 91:** Defendants deny.

92. As a direct and proximate result of Defendants' conspiracy and over acts, Frost has suffered damages, including but not limited to lost business, lost profits, and damage to its customer relationships, in an amount to be determined at trial.

**ANSWER NO. 92:** Defendants deny.

93. Defendants' conduct was willful, wanton, and malicious, justifying an award of punitive damages.

**ANSWER NO. 93:** Defendants deny.

## COUNT VI
## Unjust Enrichment
## (Against Defendant Moore and in the alternative to Count I)

94.  Frost restates and incorporates by reference the allegations contained in the preceding paragraphs of this complaint, except paragraphs 60–70.

**ANSWER NO. 94:** Defendants repeat and incorporate their responses to the allegations in paragraphs 1 through 93.

95.  Moore has received the benefit of Frost's confidential information.

**ANSWER NO. 95:** Defendants deny.

96.  Moore's retention and use of Frost's confidential information was to Frost's detriment.

**ANSWER NO. 96:** Defendants deny.

97.  Moore was receiving commissions and/or a salary from Frost while unjustly enriching himself through his unlawful retention (and subsequent use and distribution) of Frost's confidential information and breaches of his fiduciary duty.

**ANSWER NO. 97:** Defendants deny.

98.  Moore was unjustly enriched because, among other things, Moore was able to build goodwill for himself and Frost's competitors at Frost's expense.

**ANSWER NO. 98:** Defendants deny.

99.  Moore's retention of these benefits would be unjust and unfair.

**ANSWER NO. 99:** Defendants deny.

## JURY DEMAND

100.    Plaintiff demands a trial by jury.

**ANSWER NO. 100:** Paragraph 100 contains no factual allegations to which a response is required. To the extent a response is required, Defendants deny.

22

## AFFIRMATIVE DEFENSES

1.      Plaintiff fails to state a claim on which relief can be granted.

2.      The claims are barred, in whole or in part, due to Plaintiff's lack of standing because it did not acquire from Frost Control and/or does not own the claims asserted against Defendants.

3.      The claims are barred, in whole or in part, due to lack of enforceable restrictive covenants.

4.      The claims are barred, in whole or in part, because the Confidential Information and Invention Assignment Agreement was neither assigned nor assignable.

5.      The claims are barred, in whole or in part, due to Plaintiff's failure to mitigate its damages.

6.      The claims are barred, in whole or in part, by the doctrines of waiver, estoppel, unclean hands, laches, and/or any combination thereof.

7.      The claims are barred, in whole or in part, because none of the alleged acts or omissions allegedly committed by Defendants were the proximate cause of the injuries Plaintiff allegedly sustained.

8.      The claims are barred, in whole or in part, due to Plaintiff's failure to maintain information as confidential and/or waiver of confidentiality.

9.      The claims are barred, in whole or in part, because the alleged confidential information is not identified with specificity.

10.     The claims are barred, in whole or in part, because the information alleged to constitute confidential information is not confidential as a matter of law and/or pursuant to the Confidential Information and Invention Assignment Agreement.

11.     The contract claims are barred, in whole or in part, due to lack of consideration and/or unenforceability.

12.     The claims are barred, in whole or in part, due to the presence of a contract.

13.     The equitable claims are barred, in whole or in part, due to an adequate remedy at law.

14.     The claims are barred, in whole or in part, because defendants did not engage in any wrongdoing.

15.     The claims are barred, in whole or in part, because Defendants lacked the requisite intent.

16.     The claims are barred, in whole or in part, because Defendants' actions were privileged or justified.

17.     The claims are barred, in whole or in part, because Plaintiffs cannot prove the fact of or the amount of damage.

18.     The fiduciary duty claim is barred, in whole or in part, because the allegations of wrongdoing are outside the scope of any fiduciary relationship Moore may have had with Frost Control.

19.     The fiduciary duty claim is barred, in whole or in part, because Moore comported with any and all fiduciary duties resulting from his employment with Frost Control.

20.     The fiduciary duty claim is barred, in whole or in part, because Moore was not a fiduciary of Frost Control and is not a fiduciary of Frost.

21.     The civil conspiracy claim is barred, in whole or in part, due to the intracorporate conspiracy doctrine.

24

22.    The civil conspiracy claim is barred, in whole or in part, under the predominate purpose doctrine.

23.    The claims are barred because they are violative of public policy.

24.    The requests for attorneys' fees and putative damages are barred because there is no legal, contractual or equitable basis for same.

25.    Defendants reserve the right to assert additional affirmative defenses as may be determined applicable during discovery and by the evidence.

## PRAYER FOR RELIEF

WHEREFORE, Defendants respectfully request that the Court:

(1)    Dismiss the Second Amended Complaint with prejudice;

(2)    Enter judgment in favor of Defendants on each of Plaintiff's claims; and

(3)    For such other relief as the Court deems just and appropriate.


Dated this 21st day of October, 2024.    By: */s/ Maria L. Kreiter*

Maria L. Kreiter, *admitted pro hac vice*
Christie B. Carrino, *admitted pro hac vice*
Theresa M. Correa McMichen, *admitted pro hac vice*
GODFREY & KAHN, S.C.
833 East Michigan Street, Suite 1800
Milwaukee, WI 53202-5615
414-273-3500
mkreiter@gklaw.com
ccarrino@gklaw.com
tcorreamcmichen@gklaw.com

Erik J. Ives
FOX SWIBEL LEVIN & CARROLL LLP
200 W. Madison Street, Suite 3000
Chicago, IL 60606
312-224-1200
eives@foxswibel.com

*Attorneys for Defendant Cory Moore*

25

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that, on October 21, 2024, she caused the

foregoing document to be electronically filed with the Clerk of the United States District Court

for the Northern District of Illinois, Eastern Division, using the Court's CM/ECF system, which

is also served upon counsel for all parties of record.


*/s/Maria L. Kreiter*
Maria L. Kreiter

26